## KELLEY V. RHOADS, COUNTY ASSESSOR.

Taxation of Migratory Live Stock — Constitutional Law — Interstate Commerce — Statutes — Reserved Questions — Payment of Taxes in Another State — Uniformity in Assessments — Statutory Construction — Action to Recover Taxes Alleged to be Illegal, Against Whom to be Brought — Payment of Tax to Prevent Seizure of Property — Former Decision as *Stare Decisis*. Construction of Statutes Relating to Refunding Taxes Illegally Collected.

1. A statute which, in its terms, provides for the taxation of property in transit from one State to another, or which, by its terms, seeks to impose more onerous burdens upon property shipped from a foreign jurisdiction to the State imposing the burden, than is borne by other like property in such State, would be void as in conflict with the federal Constitution.

2. Property engaged in interstate commerce, by being transported through a State on its journey from one State to another, would not be subject to taxation in the State through which it might pass.

3. A law is not void as providing for the taxation of property engaged in interstate commerce, unless its necessary result is the taxation of such property.

4. Before property can be locally taxed it must have become identified and incorporated with the general mass of property in the State.

5. When live stock are brought into the State for the purpose of being grazed, they are here to be maintained; and while

here for that purpose they are identified and incorporated with the other property of the State, so as to permit of their taxation. In such case no question of interstate commerce is involved which militates against the exercise by the State of its powers of taxation. Neither by the taxation of such property is a citizen of another State deprived of any of the immunities or privileges of a citizen of this State, nor is the State attempting to make or enforce a law which abridges the rights of a citizen of the United States.

6. The length of time that such property remains cuts no figure, if the purpose be to bring them here to be grazed. Live stock may acquire *situs* in the State for the purposes of taxation, and yet remain here a comparatively short time.

7. The act of February 16, 1895 (Ch. 61) which provided for the taxation of all live stock brought into this State for the purpose of being grazed, did not encroach upon the exclusive right of Congress to regulate commerce between the several States, and was not void as conflicting with the provisions of the Constitution of the United States.

8. Personal property merely in transit through a State, upon its journey from one State to another, acquires no *situs* within the State through which it passes on such journey, and is therefore not subject to taxation therein.

9. Sheep in this region being migratory, and maintained customarily by grazing them upon the natural grasses of the soil, if the purpose of an owner in bringing sheep into the State is not alone that of transporting or driving them through the State to another State, but comprehends also that of grazing and feeding them upon the natural grasses, which is their natural source of sustenance, not as a mere necessary incident of the travel, but as one of the purposes of such movement, they would not come within the rule which exempts personal property in transit from taxation.

10. Where one purpose of bringing the sheep into the State was to drive them through on their journey to another State, then to determine whether there existed also an independent purpose to bring them here to graze, all the facts must be considered — such as the course of travel taken; the character of the territory grazed upon ; the time employed; the subsequent method of intended shipment ; the ordinary facilities for transportation by other means ; the place selected for the commencement of the journey by rail, if that is in contemplation ; possibly the time of the year, and the eventual pur-

pose of their shipment; the character of the live stock, and the manner in which such stock is customarily kept, maintained, and grown; and in general every competent fact which will tend to explain the purpose of the owner.

11.   Upon reserved questions the Supreme Court should not decide questions of fact.

12.   If it should be found as a fact that live stock — in this case sheep — had been brought into the State, in the first instance, for use or to graze, and for that reason had acquired a *situs* here, and had become incorporated with the general mass of personal property within the State; then, if such live stock were subsequently shipped out of the State, its shipment would not be deemed to have commenced until started on its final journey out of the State.

13.   Personal property, otherwise legally taxable in this State, is not exempt from taxation because it may have been returned for assessment and taxation for the same year, in another State.

14.   The provision of the State constitution requiring property to be uniformly assessed for taxation, does not mean that, in the case of the assessment of all kinds of taxable property, the same officers shall act, or that the proceedings touching the assessment shall be the same.

15.   There is uniformity in the assessment, and in the mode thereof, if the same basis of valuation is taken as to all property of like character.

16.   The statutory provision in the act of 1895 (Ch. 61), requiring immediate collection of the taxes, did not, in view of the migratory character of the property covered by the act, and other statutory provisions, infringe upon any principle of uniformity.

17.   As long as the rate and method of valuation are the same as in case of other property, a statute may be lawfully enacted affecting the taxation of a peculiar class of property to guard against its escape therefrom.

18.   Absolute equality in taxation is an impossibility.

19.   The taxation of live stock brought into this State for the purpose of being grazed while the act of 1895 (Ch. 61) was in force, was not regulated alone by that act, but under all the statutory provisions and regulations affecting the taxation of such property taken together, modifying and controlling each other.   And the owner of such property had an opportunity

for hearing and review.    1. Under the general statutes if the assessment was made before the return of the annual assessment roll.    2. Under Section 3846, R. S., if made after the regular annual assessment.    And the restrictions upon the manner of the assessment and rate of levy mentioned in Section 3846 would have controlled the assessor in taxing such property under the act of 1895.

20.    Under the act of 1895 (Ch. 61) as to live stock assessed prior to the determination of the rate of levy for the current year, the requirement for immediate collection would have been inoperative in its strict sense, as delay would have been necessary until the rate had been fixed.    In such case the command for immediate collection would have been understood to mean as soon as practicable, or immediately after the determination of the rate.

21.    Where in a suit by a taxpayer to recover taxes claimed to have been illegally collected, the agreed statement of facts upon which the cause is submitted for decision, states that the tax was paid, after a refusal to pay the same upon a demand of the officer, and to prevent the seizure and sale of plaintiff's property and the damages which would thereby accrue to the plaintiff.    Held, that the payment of the tax was made under such circumstances as would authorize a recovery of the tax by the taxpayer if the tax should prove to have been illegal: and in such case it makes no difference whether the officer threatened that he *would* take enough sheep to pay the tax, or that he *could* do so, since the concession that the payment was made to prevent seizure implies that seizure was intended or imminent, and that both parties so understood it.

22.    While it is clear that unless manifest error has crept into a former decision of the court, and works injustice, it should not be departed from, and that a mere doubt concerning its correctness is not sufficient to require its review; however, if it appears to be radically unsound and to subserve no useful purpose, but on the contrary establishes a hardship which is not within the manifest contemplation of the law, and further, if no injurious results will be likely to follow a reversal, no principle of *stare decisis* interferes with a reconsideration of the principle involved, and a reversal of the doctrine formerly announced.

23. An action to recover back taxes, when they have been paid by the collecting officer into the county treasury, should be brought against the county in its corporate name.    (Powder

River Cattle Co. v. Board, 3 Wyo., 598, and Board v. Searight Cattle Co., id. 776, in this respect, overruled.)

24. The effect of a decision of the supreme court construing a statute, renders it the law for the time being as so construed. Parties have the right to act upon such a decision, and no injury ought to be allowed to result by reason of a dependence thereon, if the decision be subsequently changed, any more than in case of a repeal of a statute.

25. As former decisions construed the statutes relating to actions for the recovery back of taxes differently from the construction now given to them, and held that such actions could only be maintained against the collecting officer when collected by county collecting officers, and turned into the county treasury, the former decisions constituted the law of the State, hence any case which has been heretofore brought against the collecting officer, in his individual capacity, should be permitted to proceed without objection on that ground.

26. In the refunding of a tax, found to be erroneous or illegal, in pursuance of the provisions of Sections 3821 and 3823, R. S., the money with which to refund the same is to be taken proportionately from each fund into which the tax has gone,— including the State tax fund, school fund, and school district fund. If there is no money in one or more of the funds when the repayment is ordered, it can be made when any such fund shall be replenished.

27. A county is included in the designation "municipal corporation" as used in the proviso in Section 3055, Rev. Stat., requiring an action for the recovery back of taxes to be brought against the municipal corporation when the money derived from the taxes has been actually paid over to the municipal corporation for whose use and benefit the taxes were levied or collected; and in the sense in which the words "for whose use and benefit it was levied or collected" are used in said section, State and school district taxes are included.

[Decided January 6, 1898.]

RESERVED Questions from the District Court for Laramie County, HON. JOSEPH L. STOTTS, Judge of Fourth District, presiding.

Plaintiff, John Kelley, having brought this action against the defendant, Oliver F. Rhoads as county assessor, to recover certain taxes collected upon a herd of sheep be-

longing to him, upon issue having been joined, the parties agreed upon a statement of facts in substance as follows: The defendant was the duly elected, qualified, and acting county assessor from the 7th day of January, 1895, until the 4th day of January, 1897. The plaintiff, who was a resident and a citizen of the State of Kansas, was the owner of certain sheep numbering about ten thousand head, which, on or about October 29, 1895, were in the county of Laramie, in charge of an agent who was driving and transporting them through the State of Wyoming from Utah to Nebraska. In driving said sheep, it was the practice to permit them to spread out at times in the neighborhood of a quarter of a mile, and while being so driven to graze over land of that width. In some instances they were driven through large pastures, in other instances through the public domain, and in other instances through pastures enclosed by fences; and while being so driven from the western boundary of the State to Pine Bluffs station (which is located near the eastern boundary) they were maintained solely by grazing along the route of travel. Said sheep were duly returned by plaintiff for taxation and were assessed for 1895 in the county of Juab, Utah.

On October 29, 1895, the defendant, in company with the deputy sheriff of the county of Laramie, collected $250 from said agent, alleged to be tax as due for the current year, 1895. Before said collection, upon demand therefor, payment was refused by plaintiff's agent, whereupon defendant stated to him that he "could" or "would" take enough sheep and sell them to pay the said taxes with costs. Thereupon, to prevent the seizure and sale of such sheep and the damages which must thereby accrue, said agent paid said sum of money to the defendant.

It was a fact, and defendant was notified thereof, that said herd of sheep was driven across this State for the purpose of shipment, and that the same were not brought into the State for the purpose of being maintained permanently therein.

At the time of the regular assessment of property for taxation for 1895, the plaintiff had no property in the

State.   At the time of such assessment, plaintiff had no notice of the time or place of the meeting of the board of equalization, or that any assessment had been made against him in said county or State; and he had no property within the State at the time the 1895 taxes were regularly and legally levied in the county of Laramie. Plaintiff demanded from defendant a return of the amount of tax so collected, which was refused.   The time consumed in driving said sheep through Wyoming was from six to eight weeks, and by the route traveled the distance was about five hundred miles.   Said taxes were assessed, levied, and collected by defendant without the action, authority, or assistance of the board of county commissioners or any other officer of said Laramie County.   Said property was not regularly assessed in any other county of the State for that year, and no taxes thereon had been paid in any other county of the State.   For shipment purposes, it was not necessary that the sheep should be driven into Wyoming, and the railroad over which they were shipped could be reached from the point from which they were first driven, by traveling a less distance than was required to drive them to any point in this State. The tax was paid without any protest other than appears above.   The amount collected was prior to the commencement of the suit, paid over by defendant to the county treasurer, and by the latter distributed in the manner provided by law — part to the State, part to the school district in which the sheep were found, and part to the county.   There is now pending in the same district court an action by plaintiff against the defendant individually for the recovery of the same money.

Upon the submission of the cause upon the facts agreed to as aforesaid, the district court reserved to this court for its decision as important and difficult questions the following:

1. Were live stock driven and transported in the manner plaintiff's sheep were, subject to taxation in the year 1895?

2. Were these sheep driven in Wyoming for the pur-

pose of being grazed within the meaning of the law authorizing the taxation of such property?

3. Does the fact that the said sheep were returned by the said plaintiff for taxation and assessed by the assessor and collector of taxes for the year 1895, in the county of Juab, Territory of Utah, exempt such property from taxation in this State for that year?

4. Was the payment of the tax by the plaintiff, under the evidence in this case, a voluntary or involuntary payment, and was the payment so made that the plaintiff would be authorized under the law to recover the taxes so paid?

5. Does the fact that the plaintiff was never given a hearing before the board of county commissioners, as a board of equalization, or was never given any notice of the assessment and levy of said taxes, render said taxes illegal so far as plaintiff is concerned?

6. Is Chap. 61, Sess. Laws 1895, authorizing county assessors to assess, levy, and collect taxes upon live stock brought into their respective counties to graze, constitutional?

7. For the recovery of taxes as paid in the manner set forth in this case, against whom should a suit be brought; and in this case is the suit brought against the proper person?

8. What judgment should be entered by this court in this case?

*Van Orsdel & Burdick*, for plaintiff.

The act of the Legislature (L. 1895, Ch. 61) requiring the assessor to levy and collect a tax from all live stock brought into the State, without regard to whether such stock is in transit or to be maintained in his county permanently, is contrary to the spirit and intent of Sec. 8, Art. 1, U. S. Const., relating to interstate commerce. The method of transportation of live stock usually designated as, "on hoof," or "by trailing," is a well recognized and regularly employed one. The animals as in transit,

that is by being driven through the State from one State to another, are no less employed in interstate commerce than when carried on cars. (Rorer, Int. St. L., 311; Cooley on Taxation, 62; Black's Const. L.,167–186; Tel. Co. v. Tel. Co., 6 Otto, 1; Brown v. Maryland, 12 Wheat., 419; Robbins v. Shelby Tax. Dist., 120 U. S., 489; Brown v. Houston, 114, id., 622; McCollough v. Md., 4 Wheat., 316; Crandall v. Nev., 6 Wall., 35; Almy v. Cal., 24 How., 169; Woodruff v. Parham, 6 Wall., 123; Welton v. Mo., 91 U. S., 275; St. L. v. Ferry Co.,11 Wall., 423; Hays v. Steam Co., 17 How., 596; Leisy v. Harden, 135 U. S., 150; Chicago v. R. R. Co., 125 id., 465; 9 Wheat., 1; 22 How., 227;147 U. S., 396;112 id., 69;18 Fed., 10;5 Wall., 557; 20 Wall., 430; Guy v. Balt., 100 U. S.,434; Walling v. Mich., 116 U. S., 446; Tel. Co. v. Tex., 105 id., 460; Tel. Co. v. Ala. Bd., 132 id., 472; In re Pa. Tel. Co., 20 Atl., 846; Coe v. Errol, 116 U. S., 577.)

It is the privilege of not only the citizens of this State, but of any citizen of the United States, to use the public roads and highways for the transportation of himself or property. To deny that right to non-residents would conflict with Sec. 2, Art. 4, and Art. 14 of the federal Constitution. The right of any person to graze his live stock upon the public domain can not be questioned, and is not a subject of State legislation. (Op. Atty. Gen'l., 1895, 1896, pp. 32, 33; Buford v. Houtz, 10 Sup. Ct. R., 307.) Double taxation is not favored by the courts. (R. R. Co. v. Jackson, 7 Wall., 262; Frontier L. & C. Co. v. Baldwin, 3 Wyo., 771.) The act of 1895 made no provision for hearing and review; and its provisions violate the constitutional mandates as to the uniformity in assessments, and prohibitions as to taking property without due process of law. (Const., Art. 1, Sec. 5, Sec. 28; Art. 15, Sec. 11; Fletcher v. Oliver, 25 Ark., 289; R. R. Tax Cases, 13 Fed., 735; Bank v. Hines, 3 O. St., 1; Desty on Taxation, 175; R. R. Co. v. Boone Co., 44 Ill., 240; Lydecker v. Englewood, 41 N. J. L., 154.) Some form of notice with an opportunity to be heard is essential to a valid assess-

ment. (Lyon Co. v. Sargent, 24 Kan., 572; Com'rs. v. Lang, 8 id., 284; Phil. v. Miller, 49 Pa. St., 449; Sligh v. Grd. Rapids, 84 Mich., 497; Three Rivers v. Smith, 99 id., 507; Cooley on Taxation, 266; 96 U. S., 104; 13 Cal., 325; 3 Neb., 43; 7 id., 253; 9 Mo. App., 255; 38 N. J. L., 83; Desty on Taxation, 600; 74 N. Y., 183; 1 L. R. A., 688; 39 Fed., 891; 18 id., 411; 13 id., 147; 30 Atl., 962.) The statute is' therefore unconstitutional because, 1. It deprives an owner of his property without a hearing. 2. Is not uniform in the mode of assessment. 3. It violates every tenet of the maxim that "the tax which each is to pay ought, as respects the time and manner of payment, and the sum to be paid, to be certain and not arbitrary." (Cooley on Taxation, 6–8.) This court has decided that an action to recover money illegally collected as taxes should be brought against the collecting officer. (Powder R. Cattle Co. v. Johnson Co., 3 Wyo.,598; Johnson Co. v. Searight Cattle Co., id., 776.) And the rule of *stare decisis* applies.

The property of plaintiff was clearly an object of interstate commerce, which fact defendant had notice of; as an object of interstate commerce, it was not subject to such legislation as interfered with its free transit across the State; the terms "commerce" and "interstate commerce" embrace the entire range of merchandise articles, and products, together with any and all recognized means of conveying or transporting such articles and products, and such articles and products come within the protection of the law from the time they are regularly started on their journey to their ultimate destination.

The transportation of live stock on hoof across the public domain and by rail is a subject which would admit of national regulation and therefore within the rule of the cases cited herein.

A statute making taxation of live stock dependent on the condition precedent of grazing is a nullity, that if not so for that reason, it is for lack of unity with other statutes regulating the levy of taxes on the same class of property.

A statute authorizing the practical confiscation of property under the pretense of taxation, without notice or hearing, can not be sustained as a proper exercise of the law-making power.

*R. W. Breckons*, for defendant.

Live stock brought into the State for the purpose of grazing is not here for shipment to foreign markets, and the assertion that its taxation is an interference with interstate commerce can not be upheld.

The imposition, modification, and removal of taxes, and the exemption of property therefrom, is an ordinary exercise of the power of State sovereignty. The taxation power of a State is one of its attributes of sovereignty. It exists independent of the Constitution of the United States, and may be exercised to an unlimited extent, except so far as it has been surrendered to the federal government. Gillman v. Sheboygan, 2 Black., 510; R. R. Co. v. Penniston, 18 Wall., 5. So long, then, as any law of the State of Wyoming imposing taxes does not by virtue of its provisions, intrench upon the jurisdiction vested by the Constitution in Congress to regulate interstate commerce, it is valid in so far as the federal Constitution is concerned. (24 Fed., 200; 21 id., 151.)

If this court will judicially notice, as we think it ought, the fact that the usual method employed in the Western country at this time of transporting live stock to market is by rail; that in the State of Wyoming and in many of the Western States live stock is maintained solely by grasses on the open range; that live stock feeding on the open range in the manner plaintiff's sheep were fed increase very largely in value; and that it is the custom of the owners of sheep, in order to increase the value of their flocks, to drive them in the manner in which plaintiff's sheep were driven, there can be no difficulty whatever in arriving at a proper answer to questions one and two. If the court will judicially notice these facts, the purpose with which plaintiff's sheep were driven into the State of Wyoming is obvious. Incidentally, it

may have been to take the sheep to market. But it is evident that the main object and purpose was to take advantage of the range afforded by the State of Wyoming to maintain their sheep in the State of Wyoming and to increase the value of the sheep by driving them across the State. If the purpose of the owner of property in taking it across any State in the Union is to take it to another State for sale or disposition, or to take it to another State for the purpose of locating there, the property can not be taxed in the State through which it passed. But the question to be determined by this court is as to the purpose of plaintiff in bringing his sheep into the State of Wyoming, it not being admitted by any means that his purpose was purely one of shipment.

The statute does not violate the provisions of the State constitution relating to taxation, or due process of law. (McMillan v. Anderson, 95 U. S., 37; Hagerman v. District, 111 id., 701; Davidson v. New Orleans, 96 id., 97; 140 id., 316; 116 id., 321; 125 id., 345; 164 id., 116; 43 Cal., 398; 25 Ind., 177; 47 Ia., 196; 19 Kan., 303; 7 Kan., 210; 19 id., 234; 20 Gratt., 661; 57 Wis., 137; 154 U. S., 425; Frontier L. & Cattle Co. v. Baldwin, 3 Wyo., 764.)

The fact that the sheep had been returned for taxation in Utah does not exempt them here. (Cooley on Taxation, 37, 219; 116 U. S., 517; 22 Fed., 54; 55 Ind., 210; 5 Gill, 231; 25 Hun, 630; 26 id., 446; 39 Mo., 476; 11 R. I., 321.) It is true that a tax voluntarily paid can not be recovered back. (1 O. St., 268; 11 id., 534; 40 id., 311; Cooley on Taxation, 809–815.) The facts agreed to in this case show that the payment was voluntary. Where payment is made in the absence of a threat to seize property, or in the face of such a threat where no protest is made, the payment is voluntary. (23 Cal., 111; 26 Mich., 121; 46 Wis., 213; 52 Wis., 391; 53 Wis., 443; 46 Cal., 600; 52 Cal., 170; 53 Cal., 379; 53 Cal., 380; 68 Cal., 241; 68 Cal., 575; 85 Ga., 468; 69 Ga., 581; 31 Pa. St., 73; 74 Me., 79; 52 Mich., 71; 54 Tex.,

278; 45 Vt., 202; 59 Vt., 131; 10 Allen, 48; 46 Hun, 87; 19 Ill. App., 409; 98 U. S., 541; 50 N. Y., 662. As to the party against whom the action should be brought, we understand the rule of *stare decisis* when applied to former decisions to be that where the Supreme Court of a State has passed upon a proposition with relation to property rights, and particularly with relation to titles to real estate, it is deemed unwise to disturb the ruling of the court and to adopt any different doctrine. But where no rights with relation to the title to property are affected, the court will be less loath to overrule the former decision. If the action should be brought against the collecting officer, then he should be sued individually and not in his official capacity. A suit against a county officer as such is in effect a suit against the county. (Com. v. Dennison, 24 How., 66; Goreman, etc., v. Sundry Slaves, 1 Pet., 110.)

*Van Orsdel & Burdick*, for plaintiff, in reply.

In whatever language a statute is framed, its purpose is determined by its natural and reasonable effect. (136 U. S., 319; 92 id., 275; id., 59.) The facts clearly establish that plaintiff was in transit with his sheep from Utah to Nebraska, and hence he was not taxable. The following cases are in point. (Conn. R. L. Co. v. Columbia, 62 N. H., 286; State v. Engle, 34 N. J. L., 427; State v. P. P. C. Co., 141 U. S., 18 (dissenting opinion).) We can not assent to the contention on the part of defendant that plaintiff has had the essential opportunity to be heard. (See Hecht v. Boughton, 2 Wyo., 403; 77 N. Y., 183; 125 U. S., 351; 1 L. R. A., 688; 8 Saw., 238; 13 Fed. 722.) Taxes illegally assessed may always be recovered back if the collector understands from the payer that the tax is regarded as illegal, and that suit will be instituted to compel its refunding. (Erskine v. Van Arsdale, 15 Wall., 75; Cooley on Taxation, 568; 1 O. St., 268; 27 Me., 145; 6 Metc.,

506; 5 id., 73; 12 Pick., 7; 3 Cush., 572.) And a payment to prevent seizure preserves the right. (4 Kan., 338.)

POTTER, CHIEF JUSTICE.

(After stating the facts as above.) Section 3776 of the Revised Statutes as amended January 8, 1891 (Chap. 36, L. 1891), prescribes what property shall be taxable, and sheep are designated therein. The county assessors commence the annual assessment as soon as they are furnished with the assessment roll with which · they are required to be provided by the county commissioners on the first Monday in April in each year. Generally, all personal property is required to be listed in the county where it may be on the first day of April of the current year, and if the owner resides out of the State, it shall be listed and assessed where it may then be. The board of county commissioners of each county is constituted a board of equalization for the correction and completion of the annual assessment roll; and they are required to hold, as such, two regular meetings in each year, at the office of the county clerk. The first meeting commences on the fourth Monday in June, and may continue not exceeding fifteen days. The second is required to commence on the fourth Monday in July, and may continue not less than three nor more than six consecutive days. At the first meeting, the board is authorized to add to the roll any omitted taxable property, and to hear and determine the complaints of all parties feeling aggrieved by the assessment of their property as returned by the assessor; and may increase, diminish, or otherwise alter and correct any assessment or valuation. It is made the duty of the county clerk to notify each person whose assessment has been raised or increased by the board, of the amount thereof. Such persons may appear before the board at either meeting and be heard respecting the same. (Section 3801, Rev. Stat., as amended by Chap. 36, L., 1890–91.)

The annual levy is required to be made by the board of county commissioners on or before the first Monday in September in each year; and thereafter the county clerk is required to prepare a tax list, and deliver the same to the collector (who is and has for many years been the county treasurer), by the third Monday of September, upon receipt of which the last named officer is required to proceed with the collection.. (Secs. 3806, 3808, Rev. Stat.)

No notice or demand on any taxpayer is enjoined, but after the date last above mentioned, all such taxes, which include State, county, and school district taxes, are due and payable at the office of the collector. (Laws 1890–91, p. 163.)

After the tax list has been committed to the collector, if he ascertains that any property has been omitted, upon his reporting the fact to the assessor, the latter is authorized to enter it upon the assessment roll, and assess the value, and the collector to enter it upon the tax list, and collect the tax as in other cases. (Rev. Stat., Sec. 3817.)

General provision is also made for the taxation of any personal property "brought, driven, or coming" into the State at any time prior to the last day of each year, and which shall remain for a period of not less than thirty days. (Rev. Stat. 3845.)

It is made the duty of the proper officers to assess such property at any time after the annual assessment, and the taxes thereon become due and collectible at the same time, and in the same manner as the annual taxes; and if assessed after such annual taxes are payable, they become due as soon as assessed and levied. As to such property, however, it is provided that in case it shall have been in the State before such assessment more than thirty days but less than six months, there shall be collected but a half year's tax, the same to be computed at one half the tax levied against other like property for the current year. From the provisions of this section, merchants and dealers are excepted as to goods and merchandise brought in to

replenish their respective stocks, and to keep them up to the amount at which they were respectively originally assessed; provided, such merchants have been assessed on their stocks for the current year.      This law was upheld in Frontier Land & Cattle Company v. Baldwin, 3 Wyo., 764.      The above outline of the laws in force prior to 1895 will assist in a proper understanding and construction of the act of February 16, 1895, in pursuance, and by authority of which the taxes involved in this suit were collected.      That act, which has since been repealed by the act of March 1, 1897 (Laws 1897, p. 113), was as follows:

Section 1.  "All live stock brought into this State for the purpose of being grazed shall be taxed for the fiscal year during which it shall have been brought into the State."

Sec. 2.  "Assessors are, for the purpose of enforcing this act, hereby vested with the powers, and charged with the duties, vested in and conferred upon other officers for the collection of taxes."

Sec. 3.  "It shall be the duty of the assessors in the several counties to levy and immediately collect the taxes provided for in this act, as soon as any live stock is brought into their counties to graze; and to pay, without delay, such amounts to the treasurers of their respective counties."

Sec. 4.  "Whenever the owner of any live stock upon which a tax has been levied as provided in this act shall refuse to immediately pay the amount of such tax to the assessor who levied it, such assessor shall proceed forthwith to collect such tax as provided by law for the collection of delinquent taxes on other kinds of personal property."      (Laws 1895, Chap. 61.)

This statute is assailed, by counsel for plaintiff, as being in conflict with that provision of the federal Constitution which grants to Congress the power to regulate commerce with foreign nations, and among the several States and with the Indian tribes; and also that provision of the

same Constitution which reserves to the citizens of each State all the immunities and privileges of the citizens in the several States; and to that portion of the fourteenth amendment providing that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." It is further contended that by the act in question a person may be deprived of his property without "due process of law," which is prohibited by Section 5 of Art. 1 of the State constitution, and that it violates the constitutional requirement of uniformity in taxation. (Const., Art. 1, Sec. 28; Art. 15, Sec. 11.) The provisions of the State constitution invoked are as follows : "No person shall be deprived of life, liberty, or property without due process of law."

"All taxation shall be equal and uniform." "All property, except as in the constitution otherwise provided, shall be uniformly assessed for taxation, and the Legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property real and personal."

The facts in the case, and the question submitted for our decision, involve a consideration of the above-mentioned propositions. Touching the provisions of the federal Constitution, the greater reliance appears to be placed by counsel upon the one affecting interstate commerce. It has been discussed, and is, perhaps, necessary to be considered in its effect upon the law, and also in its relation to the facts of the present case. It is conceded by counsel for defendant that a statute which, in its terms, provides for the taxation of property in transit from one State to another, or which, by its terms, seeks to impose more onerous burdens upon property shipped from a foreign jurisdiction to the State imposing the burden, than is borne by like property in such State, would be void as in conflict with the federal Constitution. It is urged, however, that the act in question is not such a statute. It is argued that live stock brought into the State for the pur-

pose of being grazed, is not engaged in interstate commerce. It is further conceded, that if live stock should be brought into the State from Utah on the way to Eastern markets, the purpose of the owner being solely to pass through the State on his way to such markets, it would not have been brought here to be grazed, and would not be taxable.

It is too well settled to admit of controversy that property engaged in interstate commerce, by being transported through a State, on its journey from one State to another, would not be subject to taxation in the State through which it is passing. The only question to be considered, so far as the law is concerned, is, whether its necessary result is the taxation of such property. The proposition is maintained, and is undoubtedly correct, that before property can be taxed it must have become identified and incorporated with the general mass of property in the State. Live stock in this State is, in the greater part, maintained by feeding or grazing upon the natural grasses of the soil. In the case of some kinds of live stock, they are largely allowed to roam at will, but over territory more or less confined in extent. With sheep the custom is to keep them in convenient flocks or herds, entrusted to herders, and to direct them from place to place, generally, as to a particular herd, in some certain locality, but covering in most cases a rather large and indeterminate territory. They are thus maintained until in proper condition for disposition, shipment, or other purposes of the owner. The only way in which such property becomes identified and incorporated with the other property of the State, is by being turned at large or herded, to be maintained by grazing. Whether the purpose is that they shall remain in the State permanently or not, is not a determining factor. Such a purpose does not exist in the case of the greater proportion of all the live stock in the State. The object of a cattle grower is to ship out of the State his cattle, as soon as they arrive at the proper age, size, or condition. To some extent that is also the pur-

pose which the sheep owner has in view.   When live stock are brought into this State to graze, they are here to be maintained.   While here for that purpose, they are as fully identified and incorporated with the other property of the State as it is possible for most of our live stock to become.   The length of time that such property remains cuts no figure, if the purpose aforesaid is present.   No question of interstate commerce is involved, in such case, which militates against the exercise by the State of its power of taxation.   Neither in that event is a citizen of another State deprived of any of the immunities or privileges of a citizen of this State, nor is the State attempting to make or enforce a law which abridges the rights of a citizen of the United States.   We observe no distinction, in respect to the matter under consideration, between the case of a sheep owner of Utah or some other State driving or bringing his sheep into this State, for the purpose of and permitting them to graze here, and an owner of like property residing in this State who brings in from another State other sheep for the same purpose.

In our judgment the act did not encroach upon the exclusive right of Congress to regulate commerce between the several States.   Similar statutes have engaged the attention of the courts in other States, and none, so far as we are aware, have been adjudged void as an interference with interstate commerce.   Some of them have been pronounced invalid for lack of uniformity in taxation, and as violating constitutional provisions of the State in which they were enacted, but that is a subject for subsequent consideration in this case.   A statute of Washington taxing live stock brought into that State to graze was upheld in all respects, but the question was apparently not presented, nor was it discussed in the opinion of the court, whether any provision of the federal Constitution was infringed upon.   Wright v. Stinson, 47 Pac., 761.

A much more serious question is encountered upon a consideration of the peculiar circumstances connected with the presence of plaintiff's sheep in this State.   It is well

settled that personal property merely in transit through a State upon its journey from one State to another, acquires no *situs* within the State through which it passes on such journey, and is therefore not subject to taxation therein. None of the cases cited or coming to our attention, disclose facts entirely similar to those existing in the case at bar. The case of Coe v. Errol, 62 N. H., 303, partly involved the legality of a tax assessed by a town in New Hampshire upon a lot of logs which had been cut in Maine and driven through certain lakes and rivers into the Androscoggin River, in New Hampshire, on their way to mills in Lewiston, Maine, but, on account of low water, were left in the town aforesaid during the summer. Said river was a public highway for the floating of timber and logs from the lakes and rivers in Maine, down that river to Lewiston, and had been so used by the owners of the logs for more than twenty years. It was held that as the logs were brought into New Hampshire in the usual course of transportation, and remained there no longer than was necessary under the circumstances, they were merely passing through the State, and were not taxable in that jurisdiction. It thus appears, from the facts in that case, that there existed no other design with respect to the logs than to convey them on the course of their transportation which had started in Maine, along and through regular highways for that purpose. The only cause for their delay and stoppage in the town levying the tax, was insufficient water to permit their floating farther down the river. A similar instance on principle, though not covering such a length of time, would be the case of goods in transit through the State by cars or freight wagons, and by some natural or accidental cause, further progress of the means of transportation be delayed for a time.

In State v. Engle, 34 N. J. L. 425, the property assessed was a lot of coal lying on a pier at Elizabethport which had been mined in Pennsylvania, and sent by rail to Elizabethport to be then shipped by water to other markets for the purpose of sale. That town was the terminus

of the railroad on tide water.    It was the custom to separate the coal at that place according to sizes, and when a cargo of one size was obtained to ship it to points in New England, or up the Hudson River as soon as a vessel could be chartered to carry it.    None of the coal was sold for consumption at Elizabethport.    The coal assessed was lying on the wharf awaiting shipment.    It was held that as the coal was in transit to market in other States, and delayed in New Jersey, not for the purpose of sale, but merely for separation and assortment for the convenience of shipment to its destination, a tax thereon would amount to a tax on commerce; and with regard to goods in course of transit, the court said, " Delay within the State, which is no longer than is necessary for the convenience of transshipment for its transportation to its destination, will not make it property within the State for the purposes of taxation."    And further, " Property in transit through the State, or which has been sent within the State, simply for the purpose of sale, is not to be considered as having a *situs* within such State for purposes of taxation."

The case of Connecticut River Lumber Company v. Columbia, 62 N. H., 286, is somewhat similar in its facts to Coe v. Errol *supra*.    A Connecticut corporation doing business in that State contracted for spruce logs to be drawn from Vermont and delivered on the banks of the Connecticut River, and on the river, in season for the spring drive of 1879, to be marked with the company's mark.    There was no other provision for delivery.    The logs were cut upon land in Vermont, and were on the ice in said river in the town of Columbia, in New Hampshire, when the tax was assessed, having been delivered there from day to day, during the winter of 1878–1879.    They were there for the purpose of being transported by the river to the company's mills at Hartford, in Connecticut, as soon as the season would permit, there to be manufactured.    The court said, " Upon the facts stated, the logs upon which this tax was assessed were in transit, at the time of the assessment, from Vermont, through this State

17

and Massachusetts to Connecticut. They were not brought into the State and were not in the State for sale, profit, manufacture, employment, or for any other purpose except that of transportation, and having been detained here so long only as was reasonably necessary in the use of the Connecticut River as a natural highway, they had no *situs* in this State for the purpose of taxation. They were here temporarily, and for a purpose wholly excluding the idea of a permanent lodgment in the State, or of becoming incorporated with and forming a part of the personal property of the State." Now, in the cases above adverted to, it appears that the property was within the State for the sole purpose of transportation, which had already commenced, and the delay was not unreasonable, but was in each instance only such as was necessary.

A somewhat different case is presented in Brown v. Houston, 114 U. S., 622. Certain coal was mined in Pennsylvania, exported therefrom, and imported into the State of Louisiana, and when the assessment was made by the authorities of the latter State, the coal was afloat in the Mississippi River in the original condition in which it was exported. It had just arrived by flat boats, and was held for sale by the boat load, and thereafter more than half of it had been exported by foreign steamships, and the balance sold into the interior of the State by the flat boat load. Taxes thereon had been paid in Pennsylvania. It was held that being in New Orleans, and held there for sale without reference to the destination or use which the purchasers might wish to make of it, the tax thereon was not a tax on either imports or exports, or upon commerce. After asserting that the taxing of goods coming from other States, as such, by reason of their so coming, would be a discriminating tax against them as imports, and would be a regulation of interstate commerce, the court in the opinion said, "But, if after their arrival in the State—that being the place of their destination for use or trade—if, after this, they are subjected to a general tax laid alike on all property within the city, we fail to see how such

taxing can be deemed a regulation of commerce which would have the objectionable effect referred to."

The dissenting opinion of Mr. Justice Bradley in the case of Pullman's Car Company v. Pennsylvania, 141 U. S., 30, has been cited by counsel for plaintiff as containing some expressions applicable to the case at bar. The majority opinion upholds the right of the State to impose a tax upon the capital stock of corporations engaged in transportation within the State, and having at all times a large number of cars in the State, by taking as a basis of assessment such proportion of its capital stock as the number of miles of railroad over which it runs its cars in this State, bears to the whole number of miles of the road. In announcing the reasons of himself and two other members of the court for a dissent, the learned justice used the following language, by way, evidently, of illustration: " Certainly, property merely carried through a State can not be taxed by the State. Such a tax would be a duty which a State can not impose. If a drove of cattle is driven through Pennsylvania from Illinois to New York for the purpose of being sold in New York, whilst in Pennsylvania it may be subject to the police regulations of the State, but it is not subject to taxation there." The majority opinion clearly points out the distinction between a tax upon the right to carry on a business and a tax upon the property employed therein, and it was there said, " The State, having the right, for the purposes of taxation, to tax any personal property found within its jurisdiction, without regard to the place of the owner's domicile, could tax the specific cars which at a given moment were within its borders."

The case of Brown v. Houston, *supra*, was followed in Pittsburgh, etc., Coal Company v. Bates, 156 U. S., 577, in which case it was contended that the coal and barges moored in the Mississippi River awaiting orders for their further movement, had not reached any destination. The coal was brought down the river for the purposes of sale. The principle may be deduced from these authorities that

personal property merely in transit through a State is not subject to taxation therein, as it is not to be considered as having acquired a *situs* in such State.

The decisions have been usually qualified by adding, "unless the property is there for use or sale," or some other equivalent language. Respecting the reference of Mr. Justice Bradley to the driving of cattle through the State of Pennsylvania, it must appear evident that even if he had said "sheep" instead of "cattle," such a driving through the Eastern State he mentioned, and Wyoming, would not necessarily consist of the same qualities. Live stock are not maintained in the Eastern States by grazing upon the natural grasses as is the case in this region. If driven through such a State as Pennsylvania, we apprehend the cattle or sheep would be detained at convenient places for feeding, and thus such delays would be only such as would be necessary to properly care for the stock, and the feeding would be merely an incident of the transit; but with the sheep in the case at bar they grazed, and were thus maintained as they traveled, going slowly enough to permit that, and to accomplish such purpose were allowed to spread out over an area a quarter of a mile in width, travel through pastures fenced and unfenced, or across the public domain; and they were maintained while on the journey in the same manner as if they had not been in course of transit at all. The question therefore arises whether the sheep of plaintiff were brought into the State for use, or in the language of the statute to graze; for we assume that if driven into the State for the purpose of being grazed, that is such a "use" as would come within the exception noted in the cases which have been referred to. We do not understand that an ultimate design to transport sheep out of the State is at all inconsistent with a purpose of bringing them into the State to graze. The time of the contemplated shipment may be uncertain, or it may be extended for a considerable period into the future. Incidentally, no doubt, that intention should be taken into account, but

we do not conceive it to be a conclusive circumstance in determining the *situs* of the property, or the purpose of its presence within the State.

It is altogether clear that in case of herd sheep in this country they must according to custom be maintained somewhere by grazing, until the time fixed upon has arrived for starting them upon their journey to some final destination. It may well be, that if it is not desired that they shall reach such destination before a certain time, and that in the meantime the necessity of allowing them to graze and obtain the benefits therefrom is recognized, places therefor may be selected by the owner which will subserve the latter purpose, and at the same time facilitate their final transportation when the occasion therefor shall occur. Such property is migratory; they are almost constantly moving; the character of the natural grasses, and the effect thereon by the grazing of sheep is such that such movement is necessary. They can not be permitted to remain stationary and feed in the same place a very long period of time. Therefore it follows, that, as they must move, their course can be readily directed along the direction in which they are eventually to be taken. In such a case the purpose of grazing is not inconsistent with the idea of a driving or transportation to some distant place. Nevertheless the mere fact that in such driving they are also permitted to graze upon the way will not determine, at all hazards, the character of the purpose in bringing them into the State. Each case must, it would seem, depend upon its own facts. It will not do to say that in every case, because an owner brings his sheep into the State to drive them through it to some other jurisdiction for purposes of sale or otherwise, that they are therefore merely in transit; for the reason that such a course might be selected which would consume quite a time in getting out of the State, and at the same time the animals would be maintained by grazing the same as if kept in the State from which they came, or if they had originally been within this State; and all the benefits would be

derived that would accrue in the absence of any such intended transportation.   The sheep would thus be used here in the same and only manner in which during the same time they would be used anywhere.   We are of the opinion, therefore, that in determining the purpose, and the *situs*, the course and method of travel is a proper subject, and one of the elements for consideration.   We do not dispute the proposition that.an owner of live stock, if not otherwise disobedient to the law, and is observant of the police regulations of the State, has the right to transport them to market by driving on foot, as well as by rail. Strictly speaking, they will be in transit by the one method as much as by the other.   If, however, the purpose of such owner is not alone that of transportation, but comprehends also that of grazing, and feeding them upon the natural grasses, which is their natural source of sustenance, not as a mere necessary incident of the travel, but as one of the purposes of such movement, they would not come within the rule which exempts personal property in transit from taxation.   To determine the existence or non-existence of such a joint purpose all the. facts must be considered, the course taken; the character of the territory grazed upon; the time employed; the subsequent method of intended shipment; the ordinary facilities for transportation by other means; the place selected for the commencement of the journey. by rail, if that is in contemplation; possibly the time of the year, and the eventual purpose of their shipment; the character.of the live stock, and the manner in which said stock is customarily kept, maintained, and grown, and in general every competent fact which will tend to explain the purpose in view.

These considerations seem to us to involve a mixed question of law and fact; and upon reserved questions this court should not decide questions of fact.   A direct decision upon the second reserved question is, therefore, not proper for us to render.   We have indicated such legal principles, as, in our judgment, should control the determination of that matter.   In addition to the observations

already made, we might say that whether or not the sheep were intended to remain here " permanently " is of little consequence, as that term is possible to be understood. Such property may properly acquire a *situs* in the State for the purposes of taxation, and yet remain here a comparatively short time.

If it shall be found, as a fact, reasonably deducible from the agreed statement in the case at bar, that the sheep had been in the first instance brought into the State for use or to graze, and had, on that account, acquired a *situs* within the State, the observations of the court in the case of Coe v. Errol 116 U. S., 517, would be pertinent. The court had under consideration the right of a town in New Hampshire to tax certain logs which had been brought down the winter before from some point in that State, and placed in the stream, and on the banks thereof in said town, to be from thence floated down the Androscoggin River to the State of Maine, to be there manufactured and sold. It was clear that the logs could not be taxed by reason of their intended exportation, as that would amount to laying a duty on exports which would be an infraction of the federal Constitution. Mr. Justice Bradley, speaking for the court, in the opinion, said, " Such goods do not cease to be part of the general mass of property in the State, subject as such to its jurisdiction, and a taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. * * * It seems to us untenable to hold that a crop or herd is exempt from taxation merely because it is, by its owner, intended for exportation." And in discussing the subject when the journey must be considered as begun, the learned justice said, " But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. The carrying of them in carts or other vehicles, or even floating them to the depot where the journey is to commence, is no part of that journey.

That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier, for transportation to such State, its destination is not fixed and certain. It may be sold or otherwise disposed of within the State, and never put in course of transportation out of the State. Carrying it from the farm, or the forest, to the depot, is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is not part of the exportation itself. Until shipped or started on its final journey out of the State, its exportation is a matter altogether *in fieri*, and not at all a fixed and certain thing." Hence, in the case before us, if it should be a fact that the property had already been incorporated with the general mass of personal property in the State, its shipment would not be deemed to have commenced until started on its final journey out of the State, which occurred at the time it was sent by rail from Pine Bluffs station. That station is located on the line of the Union Pacific railway which traverses from east to west the entire State. Sheep driven from the western part of the State from any point in the vicinity of Utah, in an easterly direction, would pass numerous stations on that railway, any one of many of which might be selected as a place of shipment.

The third certified question relates to the fact that plaintiff returned his sheep for assessment and taxation for the same year in Utah.

If plaintiff's property was otherwise legally taxable under the revenue laws of this State, the fact above mentioned would not exempt it in the absence of a statute to that effect. We regard that proposition as too well sanctioned by the authorities to require discussion. Brown v. Houston, 33 La. Ann., 843; id. 114 U. S., 622; Pullman's Car Co. v. Pennsylvania, *supra*, dissenting opinion; Coo-

ley on Taxation, 137, 219–221; Nelson Lumber Co v. Loraine, 22 Fed., 54; Coe v. Errol, 116 U. S., 517; Dyer v. Osborne, 11 R. I., 321.

Our own constitutional provisions, quoted in an earlier part of this opinion, are invoked in opposition to the law of 1895, and the tax collected from the plaintiff. The proposition contended for is, that, under the statute in question, the assessor was required to proceed at once; and that such peremptory action would be a violation of the constitutional rules relating to uniformity, equality, and due process of law. To sustain the proposition contended for, it is argued that uniformity and equality of taxation means equality and uniformity in the rate, and also in the mode of assessment; that, as there is implied equality in the burden, that can not exist without uniformity in the mode of assessment. It is then urged as the sole ground for the claim that there is an absence of uniformity in the mode of assessment, that no provision is made for notice, or for a hearing, or a correction of the assessment or tax as in case of property embraced in the regular annual assessment.

An examination of the authorities cited discloses that reference to the mode of assessment as concerns the rule of uniformity, does not mean that, in the case of the assessment of all kinds of taxable property, the same officers shall act, or that the proceedings touching the assessment shall be the same. There is uniformity in the assessment and in the mode thereof, if the same basis of valuation is taken as to all property of like character. The constitution itself provides for the assessment of railroads, and other common carriers, upon their franchises, roadway, rails, rolling stock, and all other property used in their operation, except machine shops, rolling mills, and hotels, by a State board for all State, county, and school district taxes; and also that such board shall fix the valuation each year for the assessment of all live stock. Const. Art. 15, Sec. 10. Property other than that owned

by common carriers is assessed by county officials, and the value of all personal property, except live stock, is determined by them.

But, is it true that the statutes provide for no hearing or review? It is evident that the law of 1895 must be construed together with other laws relating to the same subject. It seems to have been assumed that the property of plaintiff was assessed and taxed only in pursuance of that statute; but we are unable to assent to that theory. Sections 3845–3849, Revised Statutes, brought into the revision from the laws of 1884, provide for and regulate the assessment and collection of taxes on all personal property brought, driven, or coming into the State prior to the last day of the year. Those provisions were before the court in the case of Frontier Cattle Company v. Baldwin, 3 Wyoming, and were held not to contravene any of the congressional enactments which constituted the fundamental law of the Territory, and their validity under the State constitution has not been questioned, so far as we are aware. Except as far as they may have been in conflict with the act of 1895, they were in full force during that year. It is required by Section 3846 that personal property coming into the State after the annual assessment, shall be assessed at the same value as property of like kind and character is appraised and valued for the current year; and that the levy shall be the same as that made upon like property for the current year. The assessor is required to assess such property as soon as possible after he shall obtain knowledge of the existence of such property in the county, and the assessment is to be made in the same manner as other assessments. The county clerk is required to levy the tax thereon, and enter the same upon the tax list for the current year. The duty of collecting the tax devolves upon the regular county collector of taxes (Sec. 3847).

The statute of 1895 changed these provisions, somewhat, in respect to the levy and collection as to live stock brought into the State to graze. The assessor was sub-

stituted for the county clerk and collector, in regard to the levy and collection; but it seems entirely clear that the restrictions upon the manner of the assessment and rate of the levy mentioned in Section 3846 would have controlled the action of the assessor, in taxing live stock coming in to graze after the annual assessment. Such provisions are general, covering the case of any kind of personal property which is brought into the State subsequent to such annual assessment. The act of 1895 was silent concerning the basis of valuation and rate of levy, and therefore did not repeal the former statutory regulations controlling that matter. The assessable value of all live stock is fixed by the State board in March of each year. It is true that Section 3845 provides that the taxes so assessed become due and payable at the same time as other taxes, unless assessed after the regular annual taxes are payable, in which event they become due and payable upon demand. It is, however, also provided by Section 3847 that if there is danger of removal, the collector may levy upon and detain sufficient of the property and hold the same until the taxes thereon are due, unless a sufficient deposit is made with him to cover the taxes and cost.

Although the statute of 1895 required immediate collection, we do not think, in view of the migratory character of the property, and other provisions of the law which will be adverted to, that any principle of uniformity was, thereby, infringed upon. The courts have gone to great lengths in upholding the authority of the Legislature to classify property for purposes of taxation, and establish such rules, according to the nature and habits of the property, as will insure its bearing its due and proper burden of government.

In Wisconsin the statute was held valid which required the assessors to assess all logs and lumber of non-residents piled upon the banks of streams for shipment in April, although other personal property was not assessed until the first of May. This provision was evidently enacted to guard against the removal of such property

prior to May, and thereby escape taxation. (C. N. Nelson L. Co. v. Loraine, 22 Fed., 54.)

The further fact is also pertinent that the interval between the completion of the annual assessment and levy, and the time when taxes are regularly payable, is so short that a requirement of earlier payment of a tax upon migratory animals could hardly be considered unjust or inequitable.

Now, in regard to hearing and opportunity for review, it is further provided in Section 3846 that any person aggrieved by any proceedings under it and the preceding and subsequent sections, may apply to the board of county commissioners at any general or special meeting, to have the assessment equalized or corrected in any just particular; and the duty is enjoined upon the board to equalize and correct the same as justice may require; and if the party complaining has paid an unjust tax, to refund to him the amount he has paid in excess of what he ought to have paid. We perceive no reason why that regulation was not open to any person in the situation of plaintiff, or any one whose property had been taxed by the assessor under the provisions of the act of 1895, after the annual assessment. Such person would not have been taxed, solely, in pursuance of the last above mentioned act, but under all the provisions and regulations affecting the taxation of such property as they existed taken together, modifying and controlling each other. If such live stock as was covered by the act of 1895 had been assessed prior to the determination of the rate of levy for the current year by the proper officials, the requirement for immediate collection would have been inoperative in its strict sense, as delay on the part of the assessor, for purposes of collection, would have been necessary until the rate had been fixed. In such case the command for immediate collection would have been understood to mean as soon as practicable, or immediately after the rate had been determined upon. In that case, moreover, the person taxed would have had the same opportunities that all

other taxpayers were given to appear before the board of equalization.

As long as the rate and method of valuation are the same as in case of other property, we are unable to conceive of any valid reason why a statute affecting the taxation of a peculiar class of property may not be enacted to guard against its escape therefrom. Absolute equality in taxation is an impossibility. The late Mr. Justice Miller of the federal Supreme Court said, in one of the opinions of that court, that it was an "unrealized dream." In the case of Commonwealth v. Electric Light Co., 145 Pa. St., 147, the court said: "Where the measure of value and the rate are uniform and applicable to all members of a given class, the incidental hardship and inequalities must be borne." And the supreme court of Texas expressed itself as follows: "Taxes are said, within the meaning of the constitution, to be equal and uniform; when no person or class of persons in the taxing district, whether a State, county, or other municipal corporation, are taxed at a different rate than are other persons in the same district upon the same thing, and where the objects of taxation are the same by whomsoever owned or whatever they be." Norris v. City, 57 Tex., 635. The difficulty is so apparent that we shall not attempt to formulate a general definition of equality and uniformity in taxation applicable to all cases, as such words are used in the constitution. Neither is it requisite in this case that we should do so.

In 1895 the Legislature of the State of Washington enacted a law very similar to our statute of the same year. It was provided thereby, that when any cattle, horses, sheep, or goats are driven into any county of the State for the purpose of grazing at any time after the first Monday in April, in any year, they shall be liable to be assessed for all taxes leviable in that county for that year the same as if they had been in the county at the time of the annual assessment; and it was made the duty of the assessor to assess the same; and the taxes became due upon

such assessment. The sheriff was required to collect such taxes at once in the manner provided for the collection of delinquent taxes. (Laws of Wash. 1895, p. 105.) That statute came before the court in Wright v. Stinson, 47 Pac., 761, and was assailed as unconstitutional. It was held that no constitutional right was invaded by the act. Such statutes, in some other States, have been declared invalid, on the ground that there existed no provisions for taxing other kinds of personal property coming in after the annual assessment. As in Washington, so in this State, there is no discrimination in that respect.

The fourth question reserved for our decision is, in substance, whether the payment of the tax by plaintiff, under the evidence, was voluntary·or otherwise, and whether it was so made as would authorize its recovery if illegal. The facts as agreed to, are that the money was paid, after a refusal to pay the same upon a demand, and to prevent the seizure and sale of plaintiff's property, and the damages which would thereby accrue to the plaintiff. If that is true, we do not perceive what difference it makes, whether the threat made by the collector was that he *could* take enough sheep, or that he *would* do so. The concession that the payment was made to prevent the seizure, implies that seizure was intended or imminent, and that both parties so understood it. Under such a statute as that of 1895, requiring the same officer to assess, levy, and collect the taxes, giving him all the power of collecting officers, and applying to property of the character upon which these taxes were paid, it would not take very strong evidence of force to show a payment of the tax to be involuntary, particularly so when the statute, as in Section 3846, enjoins upon the commissioners the duty of refunding such an amount as they should discover to be unjust. In our judgment the payment was made under such circumstances as would authorize the recovery if the tax should prove to have been illegal.

The seventh certified question is, " For the recovery of taxes paid in the manner set forth in this case, against

whom should a suit be brought? and in this case is the suit brought against the proper person?"

Plaintiff relies upon the cases of Powder River Cattle Co. v. Board of Commissioners, 3 Wyo., 588, 603; and Board of Commissioners v. Searight Cattle Co., 3 Wyo., 776, wherein it was held that actions to recover back taxes collected by the county collector of taxes, on account of State, county, and school district taxes, can only be maintained against the officer making the collection. It is clear that unless manifest error has crept into a former decision of the court, and works injustice, it should not be departed from. A mere doubt on our part concerning its correctness is not sufficient to require a review thereof. It is equally well settled that if it appears to be radically unsound, and subserves no useful purpose, but on the contrary establishes a hardship which is not within the manifest contemplation of the law, and, moreover, if no injurious results will be likely to follow a reversal, no principle of *stare decisis* interferes with a reconsideration of the principle involved, and a reversal of the doctrine formerly announced.

In consequence of a deep feeling that nothing but hardship and injustice flows from the law as construed in those cases, and especially as the late Chief Justice dissented therefrom in vigorous opinions, we deemed it wise and expedient to examine the question anew, in the endeavor to discover whether the statutes are reasonably susceptible of the construction given them in the cases aforesaid.

It may be premised that no provision has ever been made by law for a reimbursement to the collecting officer, should a recovery be maintained against him; and that the invalidity which may require the return of a tax to the one paying it, may have been the result of the action of other taxing officials, and even of the board itself in ordering the levy. The statute, then, which imposes such onerous responsibilities upon the public servant who obeys the mandates of the tax warrant, should be unmistakable. It would be far better and more consonant with equity, that

the taxpayer should suffer in a single instance, than that one officer, possibly without fault, should bear the burden in many; or, that the loss should be distributed among several, than borne entirely by a single individual, in case the law has permitted such a loss to fall upon any one. These observations are suggested merely as incidental to an examination of the statutes themselves. They must control. They should receive such construction, however, as shall harmonize them with the general policy of our laws and institutions should their language permit it.

The statute providing the method of legal procedure to recover back taxes which may have been illegally collected, is Section 3055 Rev. Stat., and that part relating to such subject reads as follows: "Actions to recover back taxes and assessments must be brought against the officer who made the collection, or, if he is dead, against his personal representative; and when they were not collected on the tax list, the corporation which made the levy must be joined in the action; Provided, that when the money derived from said taxes or assessment has been actually paid over to any municipal corporation for whose use and benefit it was levied or collected, then an action shall be brought against said municipal corporation to recover said taxes or assessments."

That part of the section preceding the proviso was taken from Ohio, in which State the action was in all cases to be brought against the collecting officer, unless not collected on the tax duplicate. The only taxes in this State and possibly in Ohio which would not be placed on the tax list, would be local taxes for improvements, such as assessments to construct sewers in the city of Cheyenne, and in other instances where taxes are assessed according to benefits. It is evident that no taxes are collected for State or county purposes except on the tax list, but the party to be joined in an action for the recovery of taxes not on the list is described as the "corporation" without the qualifying word "municipal"; yet it is only such a corporation as a city or town which could possibly be embraced

within the provision.    When, however, a municipal corporation is mentioned in the proviso it has been thought to refer only to such a corporation in its most limited sense.    I mention this, at this time, to show that it is entirely probable that the Legislature did not intend by the use of said respective designations to confine itself to the precise use of language in legal acceptation.    The difficulty supposed to arise in the construction of this section of the statute is in the reference to a "municipal corporation" in the proviso; and a majority of the court in the cases above cited concluded that a corporation such as a "county" would not be included therein.

The first portion of the section having been imported from Ohio, it will be well to notice some of the other relative provisions of the statutes of that State then in force.    In the first place, all the regular taxes, which go upon any tax list of the State, county, school district, and of any city, village, or hamlet within the county, go upon one list prepared by the county auditor, and all such taxes are collected by the county treasurer.    The auditor is required to open an account with each township, city, hamlet, and school district, and after each semiannual settlement which he makes with the treasurer, to credit each with the net amount collected for its use, and, on the application of the treasurer of each such subordinate corporation, to give him a warrant on the county treasurer for the amount then due.    (Sec. 1047 R. S. O., 1880.)

It seems that the treasurer is charged with the taxes upon the list, and he may remain charged with an uncollected tax (Sec. 1103); but the auditor may deduct an erroneous tax, giving a certificate thereof to the taxpayer for presentation to the treasurer.    (Sec. 1038.)    The treasurer may return an account of uncollected taxes with his reasons therefor (Sec. 1101).    Finally, it is provided that in case of any recovery from him, on account of the collection of the public revenue, he shall be allowed and paid out of the county treasury counsel fees and other expenses of his defense in the suit, and the amount of any

18

damages and costs adjudged against him, all of which is required to be apportioned ratably by the county auditor, among all the parties entitled to share the revenue so collected, and deducted from the shares or portions of the revenue at any time payable to each, including as one of said parties, the State, as well as the counties, townships, cities, villages, and school districts, and other organizations entitled.    (Sec. 2862.)

It will be thus observed, that, in Ohio, the system is made plain and harmonious.    The treasurer collects for all taxing authorities, and in case of damages recovered against him, is given a sure indemnity.    At the same time a convenient method is provided, whereby a taxpayer who has been unlawfully assessed may secure a return of his money.

At the time our Legislature adopted the provision, in respect to actions to recover taxes illegally collected, it was undoubtedly perceived that the revenue laws were somewhat dissimilar to those of Ohio, that a treasurer was not given indemnity when he had dispensed the funds collected by him, and not desiring to interfere, or alter the provisions already in force concerning the collection of the public revenue, devised the more simple method of adding the proviso, to the effect that, after the municipal corporation for whose use and benefit it had been collected had received the tax, it should be made the respondent in an action for a recovery of such tax.    We think that a county is included in the designation "municipal corporation" as used in the proviso.

While it is true that in a restricted sense, and possibly, by way of distinction, the term "municipal" as applied to a corporation is generally understood to refer to such subordinate organizations as a city or town, nevertheless it is not improper, nor at all uncommon in legal parlance, to include a county within the designation "municipal corporation."    That was conceded in the majority opinion in the Powder River Cattle Company case.

A further obstacle to declaring that the county is

embraced within the meaning of the proviso, was deemed to arise from the words, "for whose use and benefit it was levied and collected." It was thought that State and school district taxes were not collected for the use and benefit of the county. If that were so, we are unable to perceive why the statute would not authorize an action against the county for the money which was actually received for its use and benefit; and why it should be allowed as to them, to hide behind the fact that there might be other money which was not held for its benefit.

The words quoted, however, must receive a reasonable construction. In view of other statutory provisions to which reference will be made, we are not inclined to apply to such words any narrow and confined meaning. As to State taxes, the county is made responsible for all which are levied, and it is not permitted to receive credit except for such assessments as are certified to be double or erroneous. A particular tax is not returned itemized to the State, but payments are made on account of the county's actual statutory liability. Such taxes are in a certain sense collected for the use and benefit of the county. It could not escape settlement with the State by an absolute refusal to collect the taxes. To relieve itself from the burden imposed upon it by law, it must collect and pay over the taxes. Whatever may be the regulations existing between the county as an organization, and the school districts within its boundaries, it levies taxes for the support of all the schools, and the special district taxes which have been legally voted by each district. The treasurer collects them, and is the custodian thereof until lawfully paid out to the district treasurers upon the apportionment and order of the county superintendent as to the common school tax, and according to law as to the special district taxes. Before school district treasurers are entitled to receive any of the money, they are required to furnish bonds to be approved by the board of county commissioners in each case, who also fix the amount thereof. The school money is referred to in the statutes as in the

county treasury. (Chap. 44, Laws 1895.) For its use and benefit, in accordance with law, the school moneys are collected and received for the county. Not, it is true, to assist in carrying on the ordinary functions of county government, but, as an agency of the State, to levy and collect taxes to support and maintain the school organizations located within its limits. In that sense we conceive that the language was used in the proviso. Such a construction does no violence to the words employed, but recognizes the various capacities in which the county acts, and the duties devolving upon it, as well as the power with which it is clothed. Neither does that construction work harshly upon the county corporation, as we shall attempt to show.

Section 3821 Rev. Stat. was thought to be in conflict with the statute above considered. We are not of that opinion, but believe that it harmonizes with it, and tends to explain it. The two sections should be so construed that both shall stand, if possible. That section is as follows: "In all cases where any person shall pay any tax, or any portion thereof, that shall thereafter be found to be erroneous or illegal, whether the same be owing to clerical errors or other errors, the board of county commissioners shall direct the treasurer to refund the same to the taxpayer, or, in case any real property subject to taxation shall be sold for the payment of such erroneous tax, the error in tax may at any time be corrected as above provided, and shall not affect the validity of the sale, but such property shall be redeemed by the county as hereinafter set forth."

The provision for redemption referred to is found in Section 3833, which, in substance, requires the county to repay to a purchaser at tax sale of any land sold by mistake or unlawfully, the amount to which he would have been entitled had the sale been legal; and the treasurer, unless the invalidity is not his fault, is made liable to the county for the amount. These two Sections, 3821 and 3833, must be construed together. The former impresses

upon the county board the absolute duty to direct the treasurer to refund any tax found to be erroneous; and in case land has been sold for such erroneous tax, the same may be corrected in the same manner, or, "as above provided," which means by directing the treasurer to refund the same. If sold, then the one entitled to payment is the purchaser, and the amount to be refunded is specified and fixed by the provisions of Sec. 3833.

Now, it is reasonably clear that the thing to be refunded is the tax. The statute does not say that the same shall be returned by a payment out of the general fund of the county, or out of any particular fund. The tax is to be refunded. That tax will have gone into various funds. The command, therefore, as I understand it, is to take the proportionate amounts from each fund. This conclusion was reached in Iowa under a similar statute. Lareman v. Des Moines, 29 Ia., 310; Stone v. County, 51 Ia., 522. See also Coal & Iron Co. v. Co. Comr's., 59 Md., 255. The erroneous character of the tax may be adjudged by the courts in a suit for a recovery of the amount paid, or by some other authorized proceeding, or the board itself may discover that it is invalid. In either event it is to be refunded to the person entitled thereto. The Legislature having constituted the county authorities and officers the agency to assess, levy, and collect the tax, and having designated the county treasurer the custodian of the proceeds, at least temporarily in all cases, it was certainly entirely competent for the law-making power to confer upon the board the authority, nay, more, to impose upon it the duty of directing the custodian to return the tax, and in doing so to take it from the respective funds into which it had gone. It might have been expressed by language more in detail, but we think it has done so by the general terms employed. Suppose the requirement had been that the treasurer refund the tax. Could there be any question but that he should take it from the funds of which it formed a part? Where is the distinction, if the legislative command is that the action of the treasurer

shall be directed by the board? Part of the tax collected being for State purposes, the statute requires it to be refunded. The treasurer by direction of the board is made the agency to return it. It is not to be expected that the identical moneys received shall be refunded in any event or under whatever construction Section 3821 might receive. There is, at all times, more or less money in the various funds which are to be dispensed to other organizations. If not, the payment can be made when any such fund shall be replenished.

Whether the amount of interest and costs which may be paid to a purchaser of lands at tax sale, and which is required to be paid to him by the county on discovery of the illegality of the sale, is to come out of the different funds, or is to be paid by the county itself, to be reimbursed by the liability of the treasurer if it exists, is a question which need not now be determined.

It is not clear to us upon what theory it can be truly said that, as to State taxes, the county should not be compelled if illegally exacted to refund them. The county is a debtor to the State for such taxes; but for all erroneous taxes charged against it, the law requires that it shall be credited; and this court has held that such credit shall be extended upon its account whenever it is certified to the proper State officer. (State v. Board of Com'rs Laramie Co., 4 Wyo. 313.) It is therefore manifest that, should the county refund such erroneous tax, it would be entitled to a credit upon its account with the State.

Under the decisions in the Powder River Cattle Company, and Searight Cattle Co. cases, a person who has paid an unlawful State and county tax is granted a remedy, but one which consists in pursuing an officer individually, who may only have done his duty skillfully and faithfully; and if that official is unable to respond, the taxpayer is still remedyless, and the right given to him is an empty one. If the amount is collected from the officer, or his representative, they are caused to bear a loss

which belongs in justice to the public. Thus, the remedy would often be without advantage to any one, and unjust whenever it should possess any merit. Under the construction, which we believe to be the only true and correct one, all those disadvantages depart; all the provisions become harmonious, and without any straining of language. It enforces the manifest legislative design. For the reasons aforesaid, it is our opinion that an action to recover back taxes, when they have been paid by the collecting officer into the county treasury, should be brought against the county in its corporate name. In the cases where the action is to be brought against the collecting officer, he must be sued individually. That seems to be the plain meaning of the statute, and it was so held in Ohio. 13 Bull, 334; Ratterman v. State, 44 O. St., 641.

The effect of a decision of the Supreme Court construing a statute, renders it the law for the time being as so construed. Parties have a right to act upon such a decision, and no injury ought to be allowed to result, by reason of a dependence thereon, if the decision is subsequently changed, any more than in case of a repeal of a statute. Hollinshead v. Von Glahr, 4 Minn., 190. Until the decision now rendered, since the announcement of the court in the cases hereinbefore referred to the law of the State has been as set forth and adjudged in those cases, at least to the extent that no one should be injured by relying thereon. Consequently, any case which has been brought against the collecting officer, in his individual capacity, should be permitted to proceed without objection on that ground. This case is not against the officer individually.

We have not arrived at the conclusion to depart from the rule heretofore announced, except after mature reflection, and a profound sense of an imperative necessity. This disposes of all the questions except the eighth, which, under our former decisions, is not a proper one for reservation.

To the first question, we answer; that, if the sheep of the plaintiff were brought into this State for the purpose of being grazed, they were subject to taxation in the year 1895.

To the second question, we have stated in this opinion the legal principles which should apply to a consideration of the fact whether or not the animals were driven in for grazing purposes; it is not proper for us to determine the fact itself in this kind of proceeding.

To the third question; our answer is in the negative.

To the fourth question; the payment was involuntary.

To the fifth question; the plaintiff was afforded by law an opportunity to be heard, as set forth in this opinion. The taxes were not illegal for any reason mentioned in such question.

· To the sixth question; Chapter 61, Session Laws 1895, was constitutional.

Our answer to the seventh question has been given above.

CORN, J., concurs.

KNIGHT, J., did not sit.