D. Waggoner & Son v. M. H. Whaley, Tax Collector.

Decided March 11, 1899.

**Taxation—Cattle in Transit—Interstate Commerce.**

Where cattle owned by citizens of Texas are shipped into this State from another State to be fattened here for market, and under a bill of lading which permits that they may be fed here for an indefinite time and then shipped out to a market in another State, the balance of the freight not to be paid if they are not so reshipped, such cattle, if here in course of fattening on January 1, are subject to local taxation, and are not exempted therefrom by the commerce clause of the Federal Constitution.

APPEAL from the County Court of Montague. Tried below before Hon. P. P. Dunford.

*Flood, Hughes & Foster,* for appellants.

*Graham & Turner* and *W. E. Tomme,* County Attorney, for appellee.

STEPHENS, Associate Justice.—This suit was brought by the appellants, D. Waggoner & Son, against the appellee, tax collector of Montague County, to enjoin the collection of a tax of $316.05 assessed against them for the year 1897 upon 1075 cattle. On final hearing the injunction previously granted was dissolved, and the appellee, upon cross-plea, recovered judgment for the amount of the taxes, from which judgment this appeal is prosecuted.

The question to be determined is whether or not the cattle were subject to taxation for the year 1897 in Montague County, Texas. That they were in that county on the 1st day of January of that year, as well as the fact that the appellants, who owned them, were citizens of this State, is conceded. Taxability is, however, denied upon the ground that the cattle were only passing through Texas en route from Oklahoma Territory to Chicago, Ill.

It appears that appellants owned a cotton seed oil mill and large pens for feeding cattle at Bowie, in Montague County, Texas, and brought the steers in question, in the latter part of the year 1896, from their accustomed range in the Oklahoma Territory to these pens to be fattened for

market. They were first driven to Waggoner, Texas, and thence carried by rail to Bowie, under written contracts fixing Chicago as the place of ultimate destination, consigned, however, to appellants themselves, and fixing the through rate of freight, which was the same from Waggoner as from Bowie. To the through rate so fixed was added in parentheses "plus $10 per car" in some, and in others, "plus $10 per 36 ft. car feed in transit priv." These contracts also provided that the cattle were "not to be transported within any specific time, nor delivered at destination at any particular hour, nor in season for any particular market."

The steers were unloaded and delivered to appellants at Bowie in October and November, 1896, and were fed by them on cotton seed meal from their oil mill, and on hay and straw from their ranch in Wichita County, for about ninety days, as originally contemplated by them, when, in January and February, 1897, they were for the most part carried to market under new bills of lading, which, however, named Waggoner as the initial point, consigned to commission companies at Chicago and Kansas City, those not so transported being sold at Bowie for foreign export via New Orleans. On these so sold appellants paid only $10 per car from Waggoner to Bowie.

Appellants had exclusive control and management of the cattle while at Bowie, and the purpose of the original carriage contracts evidently was to enable them to fatten the cattle at their pens at Bowie and then have them carried to market without the expense of the local freight charge from Waggoner to Bowie. These contracts were thus interpreted on the trial by one of the appellants in his testimony: "I always had the right, and exercised it, to ship the cattle out from Bowie to any other place, or to sell them to other parties to be transported from Bowie in any manner or to any place that they might choose, or to do anything else with them that might be desired. In shipping cattle under contracts like the one in evidence I was never compelled by the railway companies to ship such cattle on from Bowie to Chicago, unless I chose to do so, and if I did not ship them on, I did not have to pay the balance of the freight on them from Bowie on to Chicago."

In October and November, 1896, just before the steers in question were driven to Texas and hauled from Waggoner to Bowie to be there fattened for the Chicago beef market, they were located, with other cattle belonging to appellants, in their pasture in Oklahoma Territory, and appellants had there paid taxes on them from May 1, 1896, to May 1, 1897.

As these statements sufficiently outline the material facts, about which there is little or no dispute, we proceed to dispose of the question of law involved.

We are not inclined to hold that cattle in Texas while being fattened in the owner's pens for the outside markets are too transient to have a situs and to be taxable here. Indeed, feeding cattle for such markets has become, as grazing cattle has long been, a permanent as well as extensive and profitable pursuit of the Texas people. It is a local industry, and

during the feeding season the cattle, from whatever source they may come, become an important part of the mass of the personal property of the State, enjoying alike the protection of our laws and subject to the common burden of taxation. Clampitt v. Johnson, 17 Texas Civ. App., 281; People v. Niles, 35 Cal., 282; People v. Holladay, 25 Cal., 307; Kelly v. Rhodes (Wyo.), 51 Pac. Rep., 593.

Still less are we inclined to hold that cattle so situated are exempt from local taxation in consequence of the commerce clause of the Federal Constitution. If it should be so held, then to what movable property in the States may not this ever-expanding clause be extended? The paper cloak of an adjustable through bill of lading, like those found in this record, may thus be easily made broad enough to cover from local taxation all the cattle of Texas, whether grazing in pastures or on the open range or feeding in the pens. To the feeding in transit privilege need only be added the grazing in transit privilege, and all will be covered. If the owner may be allowed ninety days for feeding, why may he not be allowed six months or a year or two for grazing? In both cases the cattle may be said, figuratively speaking, to be on their way to Chicago or other market, their ultimate destination, but not in the sense of interstate commerce or tax laws. For an able review of the cases affecting this question, see Kelly v. Rhodes, 51 Pacific Reporter, 593.

Let the judgment be affirmed.

*Affirmed.*

Writ of error refused.