## MEXICAN PETROLEUM CORPORATION

*vs.*

## CITY OF SOUTH PORTLAND.

### Cumberland.    Opinion February 11, 1922.

*Imports as such under constitutional inhibition are immune from taxation.    They lose their character as such either by sale, or by being separated from the original receptacle in which they were shipped, and thus become incorporated with the general mass of property and subject to taxation.*

The levying of a local tax upon imports comes within the constitutional inhibition. There must be some point of time when imports lose their character as such and cease to possess rights superior to the general mass of property in the country.

Imported goods lose their character as imports either, first, when they have passed from the control of the importer as by sale, or second, when the original package has been broken and they have been separated from the original receptacle in which they were shipped.

On appeal. This is an appeal by the Mexican Petroleum Corporation from a decision of the Assessors of the city of South Portland in refusing to grant an abatement of a tax laid by said assessors on the "stock-in-trade" of the said Mexican Petroleum Corporation on April 1, 1920, which stock in trade consisted of oil in the tanks of said corporation located in said South Portland on land owned by said corporation. The case was taken to the Law Court on an agreed statement of facts with stipulations, that if said tax was legally assessed, judgment for defendant for $1,399.20, with interest from August 1, 1920, and costs; if tax not legally assessed, judgment to be entered for petitioner with costs determined by the court. Judgment for defendant.

The case is fully stated in the opinion.

*Verrill, Hale, Booth & Ives,* for plaintiff.

*Stepehn W. Hughes, and Hinckley & Hinckley,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

CORNISH, C. J. This is an appeal from the decision of the assessors of the defendant city refusing to abate the taxes assessed against the plaintiff for the year 1920, and comes before the Law Court on an agreed statement of facts. The following excerpts from that statement give all that is material for the decision of the case, viz.:

"On the first day of April, A. D. 1920, the day on which the petitioner was assessed for the tax appealed from, the petitioner was a corporation duly organized under the laws of the State of Maine; its principal office as provided in its charter was located in the City of Portland, County of Cumberland and State of Maine, where the Clerk's records and other corporate records were kept; its principal office for administrative purposes was in the city of Los Angeles in the State of California; it had branch offices in various parts of the United States; on said first day of April, 1920, it had a branch office in the City of South Portland under the charge of a local superintendent; said branch office was located on land in the City of South Portland owned by said petitioner, and there were also located on said land four tanks used for the purpose of storing oil awaiting its sale and delivery.

"Petitioner's branch office in said South Portland is, and at the time of the assessment of said tax was, engaged solely in the business of selling and distributing the oil from said tanks to buyers throughout the territory comprising the Northern portion of New England; all contracts of sale are passed on to the New York office for approval; all of the oil sold and delivered by the said petitioner, through its branch office in said South Portland, is imported into the United States of America from the Republic of Mexico in bulk in tank steamers; said tank steamers proceed from the port of shipment in Mexico directly to their destination at petitioner's dock in South Portland without touching at any other port. Upon the steamers reaching their destination in said South Portland the oil from said steamers is pumped from said tank steamers into the tanks hereinbefore mentioned. No other oil is sold by said petitioner in its branch office in South Portland, except such as has previously been pumped from its steamers as hereinbefore described. At the time of pumping said oil from the said steamers there is always oil in said tanks, so that the oil from any steamer is mixed with oil that has previously been imported in the same manner and pumped into said tanks from other steamers; several tank steamers thus loaded with oil from Mexico are received at South Portland by said petitioner each year and their cargoes pumped into said tanks. For the purpose of sale suction lines are laid from said tanks to the boiler houses whence the oil is pumped through pipes to tank-car loading racks, motor-truck loading racks or the bunker line on the petitioner's wharf. The oil loaded on said tank cars is sold and delivered in various parts of the territory comprising Northern New England. The oil loaded into the tank motor-trucks is sold and delivered in Portland and immediate vicinity. Some oil from said tanks is drawn out and used by said branch office for its private purposes, namely, to generate heat and power.

"The parties agree to limit the issue in this case to the question as to whether on the above agreed statement of facts the petitioner could be legally assessed for the oil in said tanks. If the Court finds that the petitioner could be legally taxed under the above statement of facts judgment shall be rendered in favor of the City of South Portland for the sum of thirteen hundred ninety-nine dollars and twenty cents ($1,399.20) with interest thereon from the first day of August, 1920, and costs. If the Court finds that the City of South

Portland did not legally assess the tax on said oil in said tanks judgment shall be rendered for the petitioner and the Court may make such order relating to the payment of costs as justice may require.''

The plaintiff's contention is that the tax upon the oil in the four tanks on the dock is a tax upon imports and therefore illegal as in violation of Article 1, Section X, Clause two of the Federal Constitution which is as follows: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws." The levying of a tax upon imports by local authorities comes within this inhibition of the constitution, so that the discussion of the case at bar is resolved into a single point, namely, whether on the first day of April, 1920, the oil of the plaintiff company accumulated in these tanks, under the admitted facts, must be regarded as still retaining its character as an import, and therefore immune from local taxation; or whether it had lost its character as an import and therefore like all other property enjoying the protection of the local government was subject to taxation for its proportional part of the expense thereof.

Chief Justice Marshall in the leading case of *Brown* v. *The State of Maryland*, 12 Wheat., 419, (1827) discussed with characteristic fullness, clearness and power the principles underlying this question and blazed a path from which the courts have not strayed for the well-nigh completed century since that decision was announced. When goods are imported into the United States from a foreign country for sale and use here, there must be some point of time at which they lose their character as an import and therefore cease to possess rights superior to the general mass of property in the country. What that point is, just where the line of separation runs, depends upon the peculiar facts of each particular case and the manner in which the importer deals with the goods imported. In some instances the line may be sharply defined; in others it may be somewhat vague and indefinite. The great Chief Justice calls attention to this in his opinion in *Brown* v. *Maryland* when he says: "The distinction exists and must be marked as the cases arise. Till they do arise it might be premature to state any rule as being universal in its application." But he continues: "It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imimported, that it has become incorporated and mixed up with the mass of property in the Country, it has, perhaps, lost its distinctive

character as an import and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution." The slight hesitation in announcing this rule as indicated by the word "perhaps" has entirely disappeared in subsequent decisions, and the general rule there announced has often been reiterated in substantially the same essence, though in varying form. · Twenty years after the decision in *Brown* v. *Maryland,* Chief Justice Taney approved of the rule there laid down and restated · it thus: "Goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the Country can in no sense be regarded as part of the mass of property in the State usually taxed for the support of the State Government." License Cases, 5 How. at Pages 575, 576, (1847).

The term "original package" later came into use, not as a statutory or constitutional term but as a judicial expression, applicable in this connection. In *Low* v. *Austin,* 13 Wall., 29, (1872) after considering the opinion in *Brown* v. *Maryland* and the License cases, the court said: "The goods imported do not lose their character as imports and become incorporated into the mass of property in the State until they have passed from the control of the importer or been broken up by him from their original cases."

The original package idea was more fully developed in *May* v. *New Orleans,* 178 U. S., 496 (1900). In that case the plaintiff was an importer of linen from Europe. The goods came in boxes or cases and in each box or case were many packages each of which was separately marked and wrapped. The importer sold each package separately. The question was whether each box or case was an original package or each separate package in the boxes and cases. The court held that the boxes or cases were to be regarded as the original packages and when such receptacles reached their destination in this country for trade or sale and were opened for the purpose of using or exposing for sale the separate packages, the goods thereby lost their distinctive character as imports and each parcel or bundle became a part of the general mass of property in the State and as such became subject to local taxation.

It may be regarded as settled then that imported goods lose their character as imports when either of two changes has taken place; first, when they have passed from the control of the importer as by sale, or second, when they have been separated from the original receptacle in which they were shipped. In the case at bar there is no claim that the oil had passed from the control of the importer. The plaintiff company still owned the property. The other question then remains whether the imported commodity had been separated from its receptacle, in other words, whether the original package had been broken.

The term original package has been defined in somewhat different language, but for the most part with a single inherent meaning. A comprehensive and satisfactory definition is this: "An original package, as applied to interstate and international commerce, is a package, bundle or aggregation of goods, put up in whatever form, covering or receptacle for transportation, and as a unit transported from one state or nation to another. It is the identical package delivered by the consignor to the carrier at the initial point of shipment in which it was shipped." 12 C. J., Page 31.

The term package in such instances comprises two things, first, a receptacle of whatever form or character, and second, the contents thereof. Both together make up the package. The receptacle may be, for instance, a box, bale, case, barrel, hogshead or even a tank as used on a tank-car, or a tank-steamer; the contents may be, for instance, in parcels or bottles, or in bulk. They may be solid or liquid. Here the receptacle was the tank-steamer and the content was the oil in bulk. The oil could not be transported from Mexico to Maine without some sort of a receptacle, and the tank-steamer was that receptacle. The importer has the right to decide for himself the form and receptacle in which he shall import his property. *Guckenheimer* v. *Sellers*, 81 Fed., 977. He may use his own container or one furnished by the carrier. In re Harmon, 43 Fed., 372. When the goods have been placed inside the container then we have a completed package and it is that identical package, that unit, that entity received, transported and delivered by the carrier which constitutes the original package, and that entity as an article of commerce is protected by the Constitution until sale or breakage of the package.

In our opinion therefore, where the oil was stored and shipped in the steamer tank, the oil and the tank together may be considered as the original package. Had there been several movable containers, as casks or barrels, there would be no contention on this point. If the importer sees fit to ship the oil in one large container instead of several small ones, the principle remains unchanged. Oil in tank-cars has been treated by the Supreme Court of the United States as in the original packages, when considering the provisions of the Interstate Commerce Act, *Askren* v. *Continental Oil Co.*, 252 U. S., 444, and by parity of reasoning, oil in tank-steamers may be similarly regarded.

The next consideration logically is, whether that original package has been broken, within the purview of the established rule, so that the contents have become a part of the general mass of property.

In our opinion it has. When the steamer reached Portland the oil was pumped from the steamer tank, the receptacle in which it had been imported, into four tanks located on shore. The original package was thereby broken. The contents were separated from the container and we can detect no real difference between removing the contents from the container and the container from the contents. If the importation had been dry goods in cases, the removal of the cases enclosing the goods would have the same effect as the removal of the goods from the cases. In either case the original unit of importation has been destroyed by separation, and that we understand to be the test. Can it be said that the oil is in its original package when it has been removed from its original container and distributed among and deposited in four different containers on the shore? Neither in fact nor in law is the original package preserved; on the contrary, for it have been substituted four new and different packages. Suppose a large tierce of liquor was imported and, after the vessel reached port, the liquor was pumped from the tierce into kegs or jugs on the wharf. Could it be successfully contended that these kegs and jugs constituted original unbroken packages?

Or suppose in the case at bar, instead of pumping the oil from the steamer tank to the shore tanks the transfer were made by workmen with buckets. Would the same claim be made? Neither the method of transfer of the contents nor the nature of the new receptacles is of importance. The vital fact is the separation itself. The fallacy in the plaintiff's contention perhaps lies in the fact that because the oil is in the same form when in the shore tanks as in the steamer's tank, therefore the importation remains unchanged. The

oil is indeed in the same form, and necessarily so; but the same is true of other imported goods after they have been removed from the receptacle in which they were imported.    That, however, is not the test.    The test is whether the integrity of the entire package, that is the imported commodity and the receptacle in which it was imported, has been preserved.    If so, the Federal Constitution says "hands off"; but if the separation has taken place and the entirety is not preserved then the constitutional inhibition is at an end.    The importer can only deal with the goods as a whole, as an entity, if he wishes them to retain immunity.    He cannot change the form of the package, nor open it, except perhaps to test its quality, nor draw from it, nor sell parts of it.    *Guckenheimer* v. *Sellers*, 81 Fed., 998. The fundamental principle which underlies all the decisions is that a local tax prematurely laid intercepts the import as an import on its way to be mingled with the general mass of property.    When, therefore, the commodity is taken out of the original receptacle in which it was transported and is broken up for distribution and sale the intent of the importer to so incorporate it with other property is clearly shown.    This is the first ground on which our opinion rests.

The second ground is the treatment of the oil after it has been pumped into the shore tanks by the plaintiff, under the test laid down in *Brown* v. *Maryland*, that is, the action of the importer upon the thing imported.    It is obvious that the oil was not placed in the shore tanks for storage as an imported article in its original package or awaiting sale in its original package.    At that stage that was physically impossible.    But it was pumped into them for immediate use and sale and for distribution among customers in such quantities as they might desire.    Further, it was in the continuous process of such sale and delivery when the tax was laid.    A part of it is delivered from the shore tanks in the regular course of business through pipes to tank-cars, for sale and delivery in various parts of New England, a part into tank motor-trucks for sale and delivery in Portland and vicinity, and a small portion is drawn out by the plaintiff for its private use in the generation of heat and power.    In fact, the four tanks on shore do not constitute four warehouses for the storage of a commodity still in the eye of the law an import, but they are virtually four wholesale and retail stores of the Mexican Petroleum Corporation, so supplied with pipes, faucets and other necessary equipment that the oil can be sold and delivered therefrom, in such quantities as may be required.

The final significant fact is this. Some oil always remains in the tanks. There is no attempt to separate one importation from another. The oil from every steamer is mingled with the unsold residuum of what has been pumped into the tanks before. That residuum is clearly taxable and when the new importation is added that too, becomes taxable. It is one indistinguishable mass in each tank, the oil as it were being pumped in at one end for distribution and sale and drawn out at the other end when actually sold and distributed. The result is that when the faucets are turned and the tanks opened for the withdrawal and sale of any portion, at that moment, if not before, the entire oil in the tanks, whenever it may have been placed there, is exposed for sale and has become a part of the common property in the State. That process serves the same purpose in dealing with this liquid that removing goods from an original package does in the case of a solid. The package is thereby broken.

This situation brings the case at bar clearly within the rule established by the Federal Court that while the payment of import duties gives the importer the right to bring his goods into this country, to sell them in the original packages, and to store them in such original and unbroken packages awaiting sale, "he does not simply by paying the duties escape taxation upon such goods as property after they have reached their destination for use or trade and the box, case or bale containing them has been opened and the goods exposed for sale." *May* v. *New Orleans*, 178 U. S., 504, supra. It is the opinion of the court that the oil in question here was taxable property as much as the shore tanks which held it.

Our attention has been called to the Per Curiam decision of two Justices of the Supreme Court of New Jersey rendered in the case of *Mexican Petroleum Company* v. *The Borough of Roosevelt*, argued at the June Term, 1919, but not reported. The facts in that case are apparently the same as in the case at bar. We have examined that decision with care, but such examination has not led us to change the result reached in the pending case.

Under the stipulation the entry must be

> *Judgment in favor of the city of*
> *South Portland for $1399.20*
> *with interest from August 1,*
> *1920*