105 P.2d 1070

**TRES RITOS RANCH CO. v. ABBOTT, County Treasurer.**

**SAME v. BAMBERGER, County Treasurer.**

No. 4537.

Supreme Court of New Mexico.

Sept. 23, 1940.

Holt & Holt, of Las Cruces, for appellant.

M. A. Threet, of Las Cruces, and C. V. Clayton, of Tularosa, for appellees.

ZINN, Justice.

This is an appeal from judgments of the District Courts of Otero and of Lincoln Counties, consolidated for the purpose of this appeal. Suits were instituted below to recover taxes claimed to have been illegally assessed, and paid under protest, on cattle imported from Mexico in four shipments over a period of several months.

Under existing Acts of Congress (46 Statutes at Large 743, 19 U.S.C.A. § 1555) and regulations of the Secretary of the Treasury and of the U. S. Customs Service, the Tres Ritos Ranch Company, petitioner and appellant here, applied for and secured authority to establish its New Mexico ranch, covering some half million acres in Otero, Lincoln and Socorro Counties as a Class 4 bonded warehouse. All of the cattle here in question entered the United States Customs at Port of Columbus, New Mexico, where they were inspected, weighed, counted and dipped, and then shipped from there by railroad to Three Rivers in Otero County, where petitioner maintained its headquarters. The cattle were shipped or driven across the international boundary by the owner, a Mexican corporation, consigned to itself. Thereupon, in the United States, the trial court found, the Mexican corporation sold and transferred said cattle to the petitioner.

The purpose of petitioner in placing these imported cattle on its ranch, as indicated by the evidence, was to graze them, fatten them, and to handle them for sale on the market, its plan being to bring such cattle out of Mexico as young as possible and to put weight on them on this side of the line. Appellant's ranch was "open range"; that is, not fenced in, so that cattle from other ranches could, and during 1936 and 1937 did, mingle at will with those belonging to the petitioner. In August, 1936, and again on January 1, 1938, petitioner sold and shipped from its ranch calves which were increase from the Mexican cattle. Bulls were imported from Texas and Colorado and commingled with the domestic cattle and the cattle imported from Mexico.

Appellant contends that the Mexican cattle were held as imports on his ranch as a government bonded warehouse under joint custody of the warehouseman and United States customs officials as provided for in the Tariff Act of 1930, and that they were not subject to taxation by or in either county under Art. 1, Sec. 10, of the Constitution of the United States until payment of duty and release by customs officials. The Act upon which appellant relies appears as Sec. 1555, Title 19, U.S.C.A. and provides: "Bonded warehouses. Buildings or parts of build-

ings and other inclosures may be designated by the Secretary of the Treasury as bonded warehouses for the storage of imported merchandise entered for warehousing * *. Such warehouses may be bonded for the storing of such merchandise only as shall belong or be consigned to the owners or proprietors thereof and be known as private bonded warehouses, or for the storage of imported merchandise generally and be known as public bonded warehouses. * * * Except as otherwise provided in this chapter, bonded warehouses shall be used solely for the storage of imported merchandise and shall be placed in charge of a proper officer of the customs, who, together with the proprietor thereof, shall have joint custody of all merchandise stored in the warehouse * * *."

The trial court found that the cattle, nevertheless, had become incorporated with the mass of the property in the state and the county wherein they were kept and were subject to taxation and, further, that the petitioner had not complied sufficiently with the terms of the Act to designate the ranch as a private bonded warehouse.

Appellant raises sixteen points in its appeal dealing with the status of the cattle as imports, with the question of who imported the cattle, and questioning the jurisdiction of a state court to construe provisions of the Tariff Act under which appellant's bonded warehouse was said to have been established.

Major issue in the case is appellant's contention that the cattle retained their status as imports and that consequently they were not subject to state taxation under the provision of the Federal Constitution that: "No state shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws." Art. 1, Sec. 10, Const.U.S.

After an article ceases to be an import by being mingled with other property in the state, it is subject to taxation by the State. Nathan v. Louisiana, 8 How. 73, 81, 12 L.Ed. 992. This well known principle was first enunciated by Chief Justice Marshall in the leading case of Brown v. Maryland, 12 Wheat. 419, 441, 6 L.Ed 678, 686, in which he said: "When the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of the property. in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing ·power of the state."

As pointed out in the case of Mexican Petroleum Corporation v. City of South Portland, 121 Me. 128, 115 A. 900, 26 A. L.R. 965, the slight hesitation in announcing the rule as indicated by the word "perhaps" has entirely disappeared in subsequent decisions.

According to the definition of imports given in Marriott· v. Brune, 9 How. 619, 632, 50 U.S. 619, 13 L.Ed 282, 288, imports can cover "nothing which is not actually brought into our limits." We can read-

ily visualize how a herd of young heifers or steers over a two-year period spent a-grazing on appellant's half million acre ranch would result in a material increase in weight, weight which was not brought into this state as an import. Yet, if we are to subscribe to appellant's view, since the original animals were imported, the State would be precluded from taxing even this increase produced in New Mexico under full protection of the laws of this state. The facts show, furthermore, that petitioner sold and shipped calves which were the increase from the cattle imported from Mexico, that cattle not owned by the petitioner were allowed to graze on the ranch and that bulls brought in from Texas and Colorado were allowed to mingle with them. On these facts it appears incontrovertible that the imported cattle became commingled with the other property of the State, just as much as a sack of imported grain when mixed with a sack of home grown grain loses its characteristics as an import and becomes subject to state taxation. We do not find that these cattle which were brought into the country, even if they were retained in the hands of the importer as appellant contends, remained in exactly the same form and shape as that in which they were imported, and that they were not commingled with the mass property within the state. See Low v. Austin, 13 Wall. 29, 80 U.S. 29, 20 L.Ed. 517.

█ Neither do imported cattle retain their character as imports so as to be immune from taxation by the mere fact that they were held within "bonded warehouses", if such indeed were the case, under provisions of the Tariff Act of 1930 (June 17, 1930, Chap. 497, Title IV, Sec. 551 et seq., U.S.C.A. Title 19, Sec. 1551 et seq.)

It is entirely illogical to contend that cattle can usually be "stored" like ordinary commodities. Storage connotes a certain degree of permanency and immobility, but grazing, or similar terms that are in use to denote the manner of harboring cattle, connote transcience. For a similar distinction, see Monument Garage Corporation v. Levy, 266 N.Y. 339, 194 N.E. 848. Storage, according to Webster's New International Dictionary, involves the safekeeping of goods. While there may be some small amount of diminution when goods are stored, it seems wholly improbable that it may include a material increase in the quantity of goods stored. Nor can it be effectively contended without straining the connotation of the word "merchandise" that it encompasses cattle or other live stock. See Brown v. United States, D.C., 298 F. 177; Jewell v. Board of Trustees of Sumner Township, 113 Iowa 47, 84 N.W. 973, 975.

█ Even if it be conceded that a United States Customs officer or a Treasury department regulation describes a pasture as a warehouse for "storage of animals", such an interpretation is not binding upon a court, even if it were one of long standing. The practice of placing imported cattle in bonded warehouses is of recent origin; hence, lacks

even an age-ripened interpretation to support it.

██ Treasury regulation, Article 921, under which appellant's ranch was recognized as a bonded warehouse, provides that stables or parts thereof may be bonded upon approval of the Bureau for storage of animals. Even *it* does not, as the trial court has so aptly indicated, provide for a ranch of a half million acres, which is not even fenced in, as a warehouse. We fail, therefore, to find that the terms of the Tariff Act or the regulations promulgated by the Treasury department pursuant thereto, exempt the cattle in controversy from the rules applicable to imports generally.

██ Appellant seeks support for its contention that the cattle have retained their status as imports by reliance on the doctrine that as long as goods imported into the United States are retained in customs custody in their *original form* and have not passed into the general commerce of the country they are not subject to state taxation, citing F. May & Co. v. City of New Orleans, 178 U.S. 496, 20 S.Ct. 976, 44 L.Ed. 1165.

This seems to us an effort by appellant, notwithstanding a disclaimer in this court of reliance thereon, to gain comfort from an application of the "original package" doctrine, through substituting the designation "original form" for the disowned appellation "original package". However that may be, we think the argument lacks force and analogy. Nor are we impressed by the contention of the appellee that each railroad stock car constitutes an "original package". We see no distinction between the terms "original form" and "original package". In the instant case it is still a cow.

We subscribe to the view that just as the fact that goods which are still in their original form affords evidence to show that they are still imports, so evidence of the fact that commodities are stored in a bonded warehouse ordinarily furnishes proof that they still retain the character of imports. Such proof, however, is not necessarily conclusive.

If immunity from state taxation is to be based upon the original package or form doctrine, it must of necessity be done by considering each individual cow still in original form as a package by itself. A herd of cattle, as such, is not a package by itself for it lacks the confining features of a container or receptacle. Similarly, on the theory of the appellee, if the cattle were transported across the border by train or truck, and the cars should be considered as the original packages, the cattle would lose their status as imports as soon as they were unloaded from the trucks or railroad cars. Mexican Petroleum Corporation v. City of South Portland, 121 Me. 128, 115 A. 900, 902, 28 A.L.R. 965. The Maine case clarifies the nature of an original package as follows: "'An original package, as applied to interstate and international commerce, is a package, bundle, or aggregation of goods, put up in whatever form, covering, or receptacle for transportation, and

as a unit transported from one state or nation to another. It is the identical package delivered by the consignor to the carrier at the initial point of shipment in which it was shipped.' 12 C.J. p. 31. The term 'package' in such instances comprises two things: First, a receptacle of whatever form or character; and, second, the contents thereof. Both together make up the package. The receptacle may be, for instance, a box, bale, case, barrel, hogshead, or even a tank as used on a tank car, or a tank steamer; the contents may be, for instance, in packages or bottles, or in bulk. They may be solid or liquid. * * * When the goods have been placed inside the container, then we have a completed package, and it is that identical package, that unit, that entity received, transported, and delivered by the carrier, which constitutes the original package, and that entity as an article of commerce is protected by the Constitution until sale or breakage of the package."

To fit a single cow or even a herd of cattle into this description of an original package puts too great a strain on judicial indulgence. Taking a single cow, on the original package theory, there is no clear-cut manner in which to differentiate the cow as the receptacle from the cow as to its contents. And the cow as the contents of its own receptacle certainly would not be the same two years after it came to graze upon appellant's ranch. The contents of the package may not be increased or substantially decreased if it is to retain its status as an import, yet in two years, young heifers and steers become full grown cattle of considerable added weight. "Receptacles", as the term has been used by the courts whose illustrations have come to our attention, were in all instances inanimate objects rather than living, animated mammals.

Accepting the appellant's theory of "original form," how long would the cow retain her original form?

We conclude, therefore, that the cattle on the hoof, such as are involved in this case, though retaining the external form of cattle, are not in any sense of the term to be placed in the category of "original packages". A further extension of the original package doctrine to embrace growing and reproducing mammals would, we believe, be contrary to the established trend of decisions by the United States Supreme Court in applying the early doctrines enunciated by this nation's highest tribunal on this subject.

■ But appellant vigorously contends that the cattle retained their status as imports as long as they were not released from customs custody. The cases of Low v. Austin, 13 Wall. 29, 20 L.Ed. 517, and F. May & Company v. City of New Orleans, 178 U.S. 496, 20 S.Ct. 976, 44 L.Ed. 1165, however, illustrate that payment of United States customs duties in itself has no effect upon when a state may impose a tax upon goods. In both cases the customs duties had been paid before the taxes were

imposed by the states, yet in one it was found that the goods had become commingled and were taxable, while in the other the court held they had not been commingled and were not taxable.

If a state cannot impose taxes after the United States customs have been paid so long as the imported article has not been commingled with the property of the state, then, conversely, a state can impose taxes before the United States customs have been paid whenever the imported article has been commingled with the property of the state. Payment of the duty is not the determinative factor.

■ If cattle are imported and held in a railroad car, pen or corral for a reasonable time, whether such a corral is or is not a bonded warehouse, the detention affords good proof quite independent of the 1930 Act that the cattle are still imports, just as the original package does with respect to goods. But when they are taken to a ranch for the purpose of grazing, fattening and breeding, the contrary is shown. Warehousing may be an incident to importation, but grazing, fattening or breeding cattle for two or three years are not. We find in Jewell v. Board of Trustees, supra, [113 Iowa 47, 84 N.W. 974], the following pertinent observation: "There are, it is true, persons who trade and traffic in live stock the same as in ordinary merchandise, but they are not feeders. They feed simply to preserve life and flesh, not to add to the avoirdupóis. They purchase with a view to immediate sale. The ordinary stock raiser buys, not for immediate sale, but to derive a profit from the produce that he feeds his stock. There is a manifest difference between a stock merchant or buyer and a stock feeder, and this distinction, we think, is preserved in the statutes."

A similar distinction should be held to exist between the buyer-importer as such and the stock raiser. The purpose of the bonded warehouse, provided for by the 1930 Tariff Act, we believe, was not to abolish this distinction and to preserve the characteristics of imports in goods or livestock in all eventualities, but merely to secure the government with respect to its import duties and other costs and expenses.

Appellants, in their sixth assignment of error, contend that the trial court erred in its "conclusion" that the "Mexico Corporation, and not the petitioner, was the importer of the cattle in question." This, however, is not a conclusion of law, but a finding of fact which is amply supported by the evidence and therefore is conclusive upon this court. After the cattle had been brought over from Mexico and even before they reached the ranch of the petitioner, they were sold to the latter by the Mexico Corporation. Immediately upon such sale, under the rule laid down by the courts, the imported cattle were incorporated into and mixed up with the mass of the property of the country and state. Low v. Austin, 13 Wall. 29, 80 U.S. 29, 20 L.Ed. 517; Wynne v. Wright, 18 N.C. 19, 23. The rule is well summarized in the

North Carolina case, as follows: "Exemption from taxation continues only until the first wholesale disposition of [the articles]. After such disposition * * * they cease to be imports * * * within the meaning of the Constitution. They then become the subjects of state taxation, in all its modifications, either on the value or on the sale, as other property may be taxed."

Regardless, however, of the correctness of the trial court's findings on this matter, for the reasons already stated, the cattle had otherwise lost their status as imports and it becomes immaterial whether it was the Mexico corporation or the appellant which imported the cattle. In view of the holdings expressed herein, also, the question of whether the trial court had jurisdiction to determine whether petitioners had complied sufficiently with the law to designate the ranch as a private or other type of bonded warehouse under the Tariff Act becomes immaterial. Likewise, the question raised by appellees, of whether appellant's documentary evidence attempting to establish petitioner's ranch as a bonded warehouse, was properly admitted in evidence, need not be considered.

For the reasons stated the separate judgments of the District Courts of Lincoln and Otero Counties, involved on this appeal, are hereby affirmed.

It is so ordered.

BICKLEY, C. J., and BRICE, SADLER, and MABRY, JJ., concur.