## In re MILLER LAND & LIVESTOCK CO.
### No. 3406.

District Court, D. Montana.
June 13, 1944.

Robert C. Stong, of Billings, Mont., for debtor, Miller Land & Livestock Co.

Bert W. Kronmiller, of Hardin, Mont., for Big Horn County, Mont.

PRAY, District Judge.

The above-entitled cause is before the court at this time for review of the decision and order of December 29, 1943, of the Conciliation Commissioner for Big Horn County, Montana, holding valid the tax assessed by said county against cattle of the above-named debtor in the amount determined by the State Board of Equalization for the State of Montana in reviewing the action of the County Board on the same subject.

Debtor claimed that the cattle in question were imported from Mexico by the debtor company and held by it in a bonded warehouse in Montana, consisting of about 160,000 acres of land, owned or controlled by it in the State of Montana, and were therefore exempt from taxation by the county. Also there was filed herein a petition of the County Treasurer of Big Horn County for approval of the Conciliation Commissioner's order, above referred to, holding valid the taxes therein specified, which may be considered in connection with the review of the Commissioner's order. By stipulation the testimony taken at the hearings before the Commissioners of Big Horn County sitting as a Board of Equalization, and on appeal before the State Board of Equalization, was admitted in evidence. As a result of the hearing on appeal, the latter Board reduced the number of cattle assessed to debtor from 8883 to 3973 and fixed the assessed valuation per head at $35, and held that the cattle were not exempt from taxation and that the taxes as fixed by the Board in the sum of $2654.42 were valid and due and payable to Big Horn County, all of which was denied and contested by debtor, who further contended that none of the cattle

assessed in Big Horn County in 1942 were in that county on the first Monday of March, but that they were cattle imported from Mexico and brought into that county under the control and in the custody of the Customs Department of the Government, according to law and regulations, citing Sec. 934, Revised Statutes of the United States, 28 U.S.C.A. § 747, Article 940(d) of the Regulations of 1937. There is no dispute as to the duty of the County Assessor to assess all property physically within the county on the first Monday in March, unless such property is declared to be exempt from taxation, and if denied, the burden would seem to be upon the declarant to establish his claim of exemption.

To show the establishment of a bonded warehouse and the warehousing of the cattle in question, debtor presented a letter under seal by the Collector of Customs showing that certain cattle to the number of 15,565 head were stored in a class four warehouse operated by debtor in Big Horn County under authority of Article 940(d), above mentioned, reading as follows: "Imported goods in bonded warehouse are exempt from taxation under the general laws of the several states." Receipts issued by the Customs service showing the holding of cattle in bonded warehouse were also introduced in evidence. This seems to be about the extent of the evidence offered in support of the testimony of the manager of debtor to show the existence of a bonded warehouse embracing 160,000 acres.

The testimony of some of the witnesses would indicate that while the warehouse was unquestionably more than adequate in size it was not sufficiently secured to hold the cattle in bond, and some of them were seen eight or ten miles from the warehouse. It is also in evidence that part of the enclosure consisted of a canyon wall which could not prevent the cattle from grazing over other lands and mingling with other livestock. There appear to have been no locked doors or gates leading to the warehouse; a public highway skirted one side protected by cattle guard entrances. It was also shown that cows and calves of the debtor, supposed to be in bond and within the warehouse above described, were seen upon the property of others.

 There seems to be no serious question involved as to the legality of the assessment under the facts and state law un-

less the cattle were exempt from taxation. Did the law authorize the establishment of such a bonded warehouse in the first place, and if so, was there a sufficient compliance to make it legal and effective. If the law did not authorize the act as described or if there was a failure in compliance, could the property then be held to be exempt from taxation. The lack of power to tax, discussed by counsel, would seem to exist only when there has been a lawful exercise of authority conferred under the bonded warehouse law and regulations. No issue is raised here as to the validity of the applicable federal statutes and regulations, only a question of compliance and legality of use under the facts presented. The material parts of Section 1555, 19 U.S.C.A., provide as follows: "Buildings or parts of buildings or other enclosures may be designated by the Secretary of the Treasury as bonded warehouses for the storage of imported merchandise entered for warehousing * * * or for the manufacture of merchandise in bond or for the repacking, sorting, or cleaning of imported merchandise. * * * Except as otherwise provided in this chapter, bonded warehouses shall be used solely for the storage of imported merchandise and shall be placed in charge of a proper officer of the customs, who, together with the proprietor thereof, shall have joint custody of all merchandise stored in the warehouse; and all labor on the merchandise so stored shall be performed by the owner or proprietor of the warehouse, under supervision of the officer of the customs in charge of the same, at the expense of the owner or proprietor."

Under the provisions of the statute quoted can cattle be classed as merchandise? Many definitions have been given and authorities cited by counsel showing that the general and usual acceptation of the word "Merchandise" might not include cattle. One definition of merchandise given by Webster is: "the object of commerce; whatever is usually bought and sold in trade; wares, goods." The same authority defines a warehouse, or to warehouse: "to deposit or secure in a warehouse, esp., to place in a government or custom house, stores, or bonded warehouse, to be kept until duties are paid. Hence, loosely, to put in safe keeping; to store up;" and he defines a warehouse: "a storehouse (sometimes a store room) for wares or goods. The term is broadly used

and may include any structure used to hold goods, stores or wares temporarily or for a length of time."

Section 1401, subdiv. (c), 19 U.S.C.A., defines "merchandise" as goods, wares and chattels of every description. This still leaves it open to argument whether cattle are to be included under the facts of the instant case. Notes under Section 1555 of the above title found in the cumulative pocket part for use in 1943 and 1944, quote extensively from the case of Tres Ritos Ranch Co. v. Abbott, 44 N.M. 556, 105 P. 2d 1070, 1073, 130 A.L.R. 963. This authority has been much discussed by counsel for both sides in the present case, consequently the court has endeavored to give it careful consideration; it seems to afford a well-reasoned decision so closely in point as to warrant counsel for the taxing authority to place reliance upon it in support of their claim.

In that case it was held that after an article ceases to be an import by being mingled with other property in the state it is subject to taxation by the state. The court there held it could be readily understood how a herd of mixed livestock grazing over such an immense acreage for a considerable period of time would increase in numbers and in weight—weight which was not brought into the state as an import; that it is illogical to contend that cattle can usually be stored in a bonded warehouse or enclosure like ordinary commodities; that "while Treasury regulation, article 921, under which appellant's ranch was recognized as a bonded warehouse, provides that stables or parts thereof may be bonded upon approval of the Bureau for storage of animals, even it does not, as the trial court has so aptly indicated, provide for a ranch of a half million acres, which is not even fenced in, as a warehouse. We fail therefore, to find that the terms of the Tariff Act or the regulations promulgated by the Treasury Deparment pursuant thereto, exempt the cattle in controversy from the rules applicable to imports generally." Appellants there contended that as long as the cattle retained their status as imports, and were kept in customs custody in their "original form" and had not passed into general commerce they would not be subject to state taxation. The court characterized this as an effort to gain comfort from an application of the " 'original package' doctrine, through substituting the designation 'original form' for the dis-

owned appellation 'original package'. However that may be, we think the argument lacks force and analogy."

Among other things of interest here, contained in that decision, the court said: "If cattle are imported and held in a railroad car, pen or corral for a reasonable time, whether such a corral is or is not a bonded warehouse, the detention affords good proof quite independent of the 1930 Act that the cattle are still imports, just as the original package does with respect to goods. But when they are taken to a ranch for the purpose of grazing, fattening and breeding, the contrary is shown. Warehousing may be an incident to importation, but grazing, fattening or breeding cattle for two or three years are not. We find in Jewell v. Board of Trustees, supra, (113 Iowa 47, 84 N.W. [973], 974), the following pertinent observation: 'There are, it is true, persons who trade and traffic in livestock the same as in ordinary merchandise, but they are not feeders. They feed simply to preserve life and flesh, not to add to the avoirdupois. They purchase with a view to immediate sale. The ordinary stock raiser buys, not for immediate sale, but to derive a profit from the produce that he feeds his stock. There is a manifest difference between a stock merchant or buyer and a stock feeder, and this distinction, we think, is preserved in the statutes.' "

Counsel for debtor challenge the state's power to tax; this raises no issue if the law and regulations governing bonded warehouses, and their establishment and maintenance, have been complied with. Counsel representing the state and county contend that the law has not been complied with, and furthermore that it was never intended to apply to such a state of facts as has been presented in this case. Counsel for debtor quoted from Cooley's Constitutional Limitations, 8th Ed., Vol. 2, page 999, underscoring the following concerning property imported: "but that while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition of the Constitution." That is the very point. According to the evidence all the property did not remain in the warehouse in the original form or package in which it was imported. This distinguished authority indicates in the same quotation that there may come a time when such im-

ported property may cease to be regarded as an import within the meaning of the prohibition, stating: "In general terms it has been said that when the importer has so acted upon the thing imported that it has become incorporated and mixed with the mass of property in the country, it has perhaps lost its distinctive character as an import, and has become subject to the taxing power of the state."

The warehouse in question is alleged to have been established by the Collector of Customs under authority conferred upon the Secretary of the Treasury, and in support of debtor's testimony to that effect, a letter from the Collector of Customs and receipts were introduced in evidence without objection by opposing counsel. No explanation seems to have been given why the interested government officials, who are alleged to have sanctioned this extended application of the warehouse law, were not present in person or by counsel to justify and defend the legality of their action, when challenged by the State, and especially if it had relation to the war effort as intimated by the manager of debtor and his counsel. When it becomes necessary to define the meaning and limitations to be placed upon the term "Bonded Warehouse", and other related words and phrases, as used here, the weight of authority and long established usage should of course have due consideration. Unless it can be read into the statute it does not seem to have been disclosed how the establishment of a bonded warehouse such as the facts here indicate, could be legally sustained; as the case is presented it would seem to be utterly beyond the scope and application of the statutes and authorities thus far within the knowledge of the court.

Could such a bonded warehouse as this, consisting of 160,000 acres, reasonably have been in contemplation of the lawmakers, and if so, was this one lawfully established and maintained. In the first place, from a plain reading of the statutes, definitions and decisions, it is difficult to conceive of a Congressional intent that could possibly embody such territorial expansion to a bonded warehouse as the court is called upon to sanction in this case; and furthermore, it will have to be admitted that the state taxing authority has established by a preponderance of the evidence that the bonded warehouse in question was lacking in security as an enclosure and consequently was not legally established and maintained; and therefore, in the opinion of the court, the Commissioner's decision should be affirmed, and such is the order herein.