Finding no reversible error in the record, the judgment of the trial court is affirmed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

On Appellant's Motion for Rehearing

DAVIDSON, Judge.

Appellant in his motion for rehearing, supplemented by able oral presentation, argues with much force his contention that the declarations of the deceased made to the witness Rose Hill were not a part of the res gestae and were therefore hearsay.

The record has again been examined in the light of this contention. To accept appellant's theory of res gestae would be to overrule a long line of decisions on this question and return to the common-law rule, which is that for a statement to be res gestae it must be strictly confined to the time of the transaction, itself. This we are unwilling to do. Moreover, we remain steadfast in the view which has often been expressed by this Court that in determining, in a given case, whether evidence be a part of the res gestae the conclusion of the trial court must be given great weight. Nami v. State, 97 Tex.Cr.R. 522, 263 S.W. 595. The conclusion here reached is the same as stated in Glover v. State, 126 Tex.Cr.R. 56, 70 S.W. 2d 155, 161, where we said: "We realize the great difficulty under which the trial court labors in determining the admissibility or otherwise of statements claimed to be res gestæ whether such statements are offered by the state or the accused, and we are acutely aware of the difficulty which confronts this court in reviewing the action of the trial court in the regard mentioned. Under the facts presented in the present record, and which have been detailed at some length in our original opinion, our view remains as therein expressed that the action of the trial court should not be held to have been an abuse of judicial discretion in the premises."

Appellant's motion for rehearing is overruled.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

**STATE v. HARPER.**

No. 11495.

Court of Civil Appeals of Texas.
San Antonio.
May 16, 1945.

Rehearing Denied June 13, 1945.

Grover Sellers and R. Dean Moorhead, both of Austin, H. C. Petry, Jr. and B. L. Jeffrey, both of Carrizo Springs, and Geo. W. Barcus and Arthur L. Moller, both of Austin, for appellant.

David E. Hume, of Eagle Pass, for appellee.

MURRAY, Justice.

This suit was instituted by the State of Texas in the District Court of Dimmit County against O. S. Harper, seeking to recover the amount of State, County and School taxes alleged to be due on "2202 Plain Mexican Steers, Bulls and Stags," situated in Dimmit County, Texas, on January 1, 1942. Harper defended the suit upon the theory that on January 1, 1942, the day the tax was levied, these steers, bulls and stags were imports and therefore not subject to tax by the State or other local taxing agencies.

These cattle were imported from Mexico by Harper and placed in what may be called "Bonded Pastures" in Dimmit County. The cattle were brought to the middle of the international bridge at Eagle Pass in railroad cars and there turned over to the United States customs authorities who placed their seals on the doors of the cars and took them to the stockyards in Eagle Pass, where the cattle were unloaded, weighed and counted, then reloaded in "bonded trucks" and taken to the ranches in Dimmit County where they were turned loose on the range. Some of the cattle were put on one pasture, containing something over 15,000 acres, and others were put in another pasture containing more than 3000 acres. These pastures were bonded by the collector of customs. The cattle while in these pastures were in the joint custody of the United States Customs Officers and the owner of the cattle. The cattle were unable to make it through the winter by grazing alone and pear was burnt for them. During January Harper executed a chattel mortgage upon these cattle in favor of a Kansas City Bank to secure that bank for the money it had advanced to him and with which he had purchased the cattle in Mexico. During the middle of April, 1942, these cattle were gathered and taken to the stock pens in Catarina, Dimmit County, where they were again loaded in railroad cars, and these cars were again sealed by customs officers. The cattle were shipped to Kansas and there placed in "Bonded Pastures," where they were fattened on Kansas grass and finally marketed in Kansas City, Missouri. The cattle did not fatten while being pastured in Dimmit County. The customs duties were not paid upon the cattle until they were marketed in Kansas City.

The trial judge concluded as follows:

"1. This case is governed by the rule that property while in the course of importation from a foreign country and while in

custody of the Customs officials with duties remaining unpaid, and while in the original package and not having been commingled with the general mass of property in the State, is not subject to taxation by the State.

"2. The regulation of the Secretary of the Treasury under which pastures may be designated as bonded warehouse enclosures and cattle held in bond within such enclosures for a period of not more than three years, is valid.

"3. Neither the fact that one cow happened to be in the pasture when the cattle were put in there or probably found its way in there afterwards with no intention on the part of any of the parties that it be there, nor the fact that a few head succeeded in making their escape and were out of the pasture a short while before being found and returned (since the pasture was inspected and found reasonably secure for confining cattle), being merely accidental circumstances, constitutes, as a matter of law," commingling with property in the State."

and rendered judgment that plaintiff take nothing, from which judgment the State of Texas has prosecuted this appeal.

The appeal presents but one controlling issue, which may be stated as follows: Had the steers, bulls and stags, imported from Mexico by Harper, ceased to have the status of imports on January 1, 1942, so as to become subject to the tax which the State is attempting to collect?

The fact that the customs duties had not been collected is not determinative of the issue, nor is the fact that the cattle were not released from the custody and control of the customs officers a deciding factor.

■ The rule seems to be well settled that cattle, or other property or merchandise imported from a foreign country has the status of imports not only while it is in the actual process of being imported, but so long thereafter as it remains segregated and is not incorporated into the general mass of property in the state. Brown v. Maryland, 12 Wheat 419, 6 L.Ed. 678.

Article 1, Section 10, of the Constitution of the United States provides as follows:

"No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports * * * except what may be absolutely necessary for executing it's inspection Laws."

It is plain that so long as cattle retain their status of imports they are not subject to taxation by local taxing agencies, except for the very limited purpose stated and which is not involved here.

Thus we come to the question of whether or not the Harper cattle running on the range in Dimmit County, under all the circumstances had been incorporated into the general mass of property of Dimmit County, so as to render them subject to State and County ad valorem tax. Section 1555, Title 19 U.S.C.A., provides in part as follows:

"Buildings or parts of buildings or other inclosures may be designated by the Secretary of the Treasury as bonded warehouses for the storage of imported merchandise entered for warehousing * * * or for the manufacture of merchandise in bond, or for the repacking, sorting, or cleaning of imported merchandise. * * * Except as otherwise provided in this chapter, bonded warehouses shall be used solely for the storage of imported merchandise and shall be placed in charge of a proper officer of the customs, who, together with the proprietor thereof, shall have joint custody of all merchandise stored in the warehouse; and all labor on the merchandise so stored shall be performed by the owner or proprietor of the warehouse, under supervision of the officer of the customs in charge of the same, at the expense of the owner or proprietor."

If it can be said that cattle running on the range in Dimmit County in two bonded pastures, one containing more than 15,000 acres and the other more than 3,000 acres, are merchandise stored in a bonded warehouse in the original package, then unquestionably they were not subject to the tax. It has been decided that cattle so running on the range are not merchandise stored in a bonded warehouse in the original packages. Tres Ritos Ranch Co. v. Abbott, 44 N.M. 556, 105 P.2d 1070, 130 A.L.R. 963; In re Miller Land & Livestock Company, D.C., 56 F.Supp. 34.

■ It is true that in the Tres Ritos case the pasture consisted of 500,000 acres of unfenced range and in the Miller case, of 150,000 not securely fenced, but we do not believe that these were the deciding factors in those cases. It occurs to us that the fact that the cattle were running on the range, sustaining themselves from the substance of the land in the same manner as other cattle

in the county, and had thus become incorporated with the general mass of property in the State, was the determining factor. If the rule were otherwise, Dimmit County might be fully stocked each year with cattle from Mexico and yet the local authorities be unable to derive any revenue from such property. All a person would have to do would be to bond his pasture, import cattle, put them in the pasture, not keep them more than three years, and thus avoid local taxation. It is a well-known fact that most of the land in Dimmit County and other Southwest Texas Counties is pasture or grazing land. A large part of local taxes is derived from an ad valorem tax on the livestock running on the range in such counties. If imported cattle running in a bonded pasture are to be exempt from local taxes for a period of three years it would be a simple matter to deprive these counties of all this revenue.

■ Mr. Chief Justice Marshall decided many years ago, in Brown v. State of Maryland, supra, 12 Wheat 419, 6 L.Ed. 678, that while imports remained the property of the importer, in his warehouse, in the original form or package, they were not subject to the taxing power of the State. But this rule cannot be made to apply to cattle running on the range. There is evidence in this case that it took a crew of cowboys two weeks to gather these cattle. Under such circumstances we cannot agree that they were simply merchandise stored in a "bonded warehouse." Neither can these cattle be said to be in their original form or package. If they were ever in a package it was the freight car in which they were brought across the border, or it was the truck in which they were hauled to the pastures in Dimmit County. It was certainly not their own hides. If a steer may be said to be an original package so long as he stays in his own hide, then he will be an original package until his death. We can come to no other conclusion than that the rule to the effect that merchandise stored in a bonded warehouse in the original package is free from state and local tax simply does not apply to cattle running on the range. They are not merchandise, they are not stored, and they are not in original package within the meaning of the language used in the above rule. Tres Ritos Ranch Co. v. Abbott, supra; In re Millar Land & Livestock Co., supra.

■ The fact that Harper intended to ship these cattle to Kansas was insufficient to give them the status of goods in interstate commerce. These cattle were not being shipped on a through bill of lading with the privilege of a stop-over. There was nothing to compel Harper to ship these cattle to Kansas if he did not desire to do so when spring came. He could pay the customs duty on these cattle and thereafter do with them as he pleased. These cattle were no more in the process of being shipped to Kansas than would have been the cattle of any other South Texas ranchman who had leased a pasture in Kansas and had steers in Texas to which he intended to gather in the spring of the year and ship to Kansas. Bacon v. People of State of Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615; State of Minnesota v. Blasius, 290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131; Waggoner et al. v. Whaley et al., 21 Tex.Civ.App. 1, 50 S.W. 153; Kelley v. Rhoads, 7 Wyo. 237, 51 P. 593, 39 L.R.A. 594, 75 Am.St.Rep. 904.

■ There can be no doubt that when Harper executed the mortgage on the cattle in January, 1942, he exercised such a beneficial use of the property as to prevent them from thereafter being regarded as imports. Southern Pac. Co. v. City of Calexico, D. C., 288 F. 634, 641. In that case, in speaking of the effect of placing a mortgage on imported cotton, the court said:

"Such action on the part of the owner of the cotton, I am fully persuaded, constituted such a beneficial use of the same, such a disposition of it, such a segregation of it from its character as an import, as to make it amenable to the right and taxing power of the state."

■ Appellee, Harper, contends that in any event some of the cattle arrived in Texas after January 1, 1942, and therefore the assessment was for too many cattle. Harper personally rendered these cattle and set the number at 2202. He made no attempt to go before the board of equalization and correct any mistake he may have made as to numbers. His complaint now comes too late.

■ In 40 Tex.Jur. § 88, p. 125, it is stated:

"In the absence of pleading and proof of non est factum, fraud or mistake, just as in a suit on a promissory note, a rendition of property for taxes is binding on the owner under the doctrine of estoppel. Thus it has been held that an owner may not complain where he rendered several tracts in solido, that such tracts were not separately as-

**404**

sessed; nor of an insufficient or meager description of the property on the roll, if it corresponded with the description as furnished by himself; nor of an assessment in the name of a decedent as rendered; nor of a tax computed on the value of property as returned by him."

See also, Pfeiffer v. City of San Antonio, Tex.Civ.App., 195 S.W. 932.

The judgment of the trial court is reversed and judgment here rendered for appellant for the full amount sued for.

Reversed and rendered.